Argued and submitted June 15; resubmitted In Banc October 10, 1995, affirmed
January 24, 1996

# STATE OF OREGON,
*Respondent,*

*v.*

# DIANE JAMIE BALDERSON,
*Appellant.*

## (D9304698T; CA A82320)

910 P2d 1138

John Henry Hingson III argued the cause and filed the brief for appellant.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. On the brief were Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, Harrison Latto, Assistant Attorney General, and Richard J. Davies, Certified Law Student.

DEITS, J.

Edmonds, J., concurring.

Haselton, J., dissenting.

## DEITS, J.

Defendant appeals her conviction by a jury for driving under the influence of intoxicants (DUII). ORS 813.010. She contends that the results of an Intoxilyzer test should have been suppressed because she regurgitated during the 15-minute pretest observation period. We affirm.

Tualatin Police Officer Manion arrested defendant for driving under the influence of intoxicants and brought her to the police station for an Intoxilyzer test. Before administering the test, Manion watched defendant for 15 minutes, as required by the administrative rules, and did not observe any signs that she had taken anything by mouth or regurgitated. He also completed a police department pretest checklist, which included an examination of defendant's mouth. He did not, however, expressly ask her whether she had, in fact, regurgitated. She testified that she had inaudibly regurgitated during the 15-minute pretest observation period. The Intoxilyzer results indicated a .18 percent blood alcohol level.

Defendant moved to suppress the results of the Intoxilyzer test, asserting that she had silently regurgitated shortly before the test was administered and that the fact that she did regurgitate compelled suppression pursuant to OAR 257-30-020(1)(b). That regulation reads:

> *"Pre-Test Requirement.* The operator must *make certain* the subject has not taken anything by mouth, (drinking, smoking, eating, taking medication, etc.) vomited, or regurgitated liquid from his stomach into his mouth, for at least 15 minutes before taking the test[.]" (Emphasis supplied.)

Defendant argued to the trial court that the regulation's purpose is to insure the reliability of breath test results, which can be compromised by regurgitation. Consequently, she contended, regardless of the administering officer's efforts to "make certain," the mere fact of regurgitation rendered the test results void and compelled their suppression.

The trial court denied defendant's motion, concluding that, even assuming that defendant had regurgitated unbeknownst to the officer, the test results should not be suppressed because Manion had made an objectively reasonable effort to "make certain" that defendant had not regurgitated:

"Defendant's testimony that she, without any outward or perceptible sign, inadvertently brought 'acid' into her mouth, even if believed, does not render the test inadmissible. Her testimony may explain the test result and convince the jury that it does not help them determine her blood alcohol content at the time of driving as opposed to at the time of testing.

"The OAR requirement addresses the officer's responsibility. He satisfied that. Using all human faculties, he made certain. The OAR does not require that the officer make inquiry. This officer had no evidence that would cause any lack of certainty."

Defendant assigns the trial court's ruling as error. She argues:

"An Oregon Administrative Rule requires that a breath test operator make certain that a person taking a breath test has not regurgitated liquid from the stomach into the mouth within fifteen minutes before taking the test. This defendant regurgitated liquid from her stomach into her mouth in the fifteen minutes before taking the test. Because violation of the administrative rule effected [sic] the scientific accuracy of the breath test, the evidence was improperly admitted."

The issue before us is whether the trial court erred in concluding that the rule was satisfied. Consequently, we must decide what OAR 257-30-020(1)(b) requires. The pertinent language of the rule provides that the operator "must make certain" that the subject has not taken anything by mouth, vomited or regurgitated for at least 15 minutes before taking the test.

We must first consider the text and context of the rule. The dissent concludes that the language of "the rule focuses on the objective truth"; whether, *in fact*, the subject has taken anything by mouth, vomited or regurgitated during the 15-minute pre-test observation period. However, that is not what the rule provides. Rather, the language of the rule focuses on the *conduct of the officer*. Under the rule, the officer is directed to take certain actions to ensure that the breath test is properly performed. Although the dissent's recitation of the meaning of the term "certain" is accurate, that word cannot be considered in a vacuum. It must be read together with the other words of the rule, which direct the conduct of the person administering the test.

■      The language of the rule must also be read consistently with its context. OAR 257-30-020(1)(b) was adopted pursuant to ORS 813.300 and ORS 813.160(1)(b). ORS 813.300 authorizes the use of blood alcohol percentages as evidence in a DUII case. ORS 813.160(1)(b) provides that to be valid under ORS 813.300, chemical analyses of a person's breath shall be performed according to methods approved by the state police. OAR 257-30-020(1)(b) was adopted by the Oregon State police to carry out that responsibility. Accordingly, it is clear that the rule's purpose is to provide the methodology designed to assure that breath test results are accurate. However, there is nothing in the language of the statutes or the rule that provides that the methodology must *guarantee* that the test results are completely accurate.

Under the dissent's view, evidence that the procedures required by the rule have been followed may be irrelevant. As the dissent reads the rule, any evidence that a subject vomited, regurgitated or took something by mouth, if believed by the court, would be completely determinative of compliance with the rule and, consequently, admissibility,[1] regardless of the particular circumstances. Essentially, the dissent reads the rule to require that the pretest procedures *guarantee* that the Intoxilyzer tests are completely accurate. Under that reading of the rule, even if all of the procedures required by the rule have been completely satisfied, if a subject manages to regurgitate without the observing officer knowing it and later manages to convince the court that this occurred, the court would be required, as a matter of law, to

---

[1] The concurrence would hold that compliance with the administrative rule is not determinative of the admissibility of the Intoxilyzer test results in a judicial proceeding. First, we do not believe it is appropriate to address this issue as it was not argued by the parties. Further, the holding suggested by the concurrence would be inconsistent with our existing case law. *State v. McVay*, 83 Or App 312, 731 P2d 466 (1987). *See State v. Demings*, 116 Or App 394, 841 P2d 660 (1992), *rev den* 315 Or 443 (1993); *State v. Herring*, 112 Or App 83, 827 P2d 932 (1992); *State v. Lessar*, 105 Or App 512, 805 P2d 730, *rev den* 311 Or 482 (1991); *Gildroy v. MVD*, 100 Or App 538, 540, 786 P2d 757 (1990), *aff'd* 315 Or 617, 848 P2d 96 (1993); *State v. Leach*, 94 Or App 778, 767 P2d 463 (1989); *State v. Goddard*, 87 Or App 130, 741 P2d 540 (1987); *State v. Allen*, 74 Or App 275, 702 P2d 1118, *rev den* 300 Or 111 (1985); *State v. McClary*, 59 Or App 553, 557, 651 P2d 145 (1982); *State v. Kacalek*, 34 Or App 967, 580 P2d 205 (1978); *State v. Hanson*, 19 Or App 498, 501-02, 528 P2d 100 (1974). Finally, contrary to the concurrence's assertions, its holding is not required by *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995), because, in this case, the legislature has delegated the appropriate authority to the agency. ORS 813.300(1); ORS 813.160(1)(b).

conclude that the rule was not complied with and that the results of the Intoxilyzer test were inadmissible.

■■ We conclude that the pertinent inquiry in ascertaining whether the rule has been complied with is whether the observing officer has followed the precautions required by the rule. If so, the rule is satisfied and the evidence of the test results is admissible. Accordingly, evidence that a subject did, in fact, take something by mouth, or regurgitated during the observation period, does not *automatically* mean that the rule was not satisfied. However, such evidence is not irrelevant. This evidence may be pertinent to whether the procedures of the rule really were followed. For example, if the evidence shows that the subject did take something by mouth or regurgitated during the observation period and that an examiner would have observed these events if following the proper procedures, such evidence would be pertinent to the court's decision as to whether the rule's procedures were followed. For instance, if a subject testifies that he or she loudly and visibly vomited during the observation period, and the court believes that testimony, this could be the basis of the court's determination that the pretest procedures were not complied with.

■ There is, however, no such evidence here. The trial court concluded that Manion used "all human faculties" to make certain that the defendant did not take anything by mouth, vomit or regurgitate liquid from her stomach to her mouth and that, accordingly, the rule was satisfied. The trial court's determination is supported by the evidence and is consistent with the language of the rule.

■ Defendant argues and the dissent agrees that its understanding of the rule is compelled by our prior case law. We disagree. Defendant first relies on *State v. Hanson*, 19 Or App 498, 528 P2d 100 (1974), for the proposition that as a result of what occurred here, the test result is "void" and is not "valid" under ORS 813.300. In *Hanson*, the defendant moved to suppress the results of a breathalyzer test on the ground that the officer who was performing the test had failed to "make certain" that the defendant had not regurgitated within the 15-minute observation period as required by an administrative rule (OAR ch 333) promulgated under *former* ORS 483.644(1), the predecessor to ORS 813.160(1)(b). The

officer administering the test testified that he did not see the defendant drink, smoke, eat, take medication, vomit or regurgitate liquid during the pertinent time. On cross-examination the officer conceded that the defendant had coughed just before taking the test. The defendant produced no evidence. The trial court excluded the test result from the evidence on the ground that the rule was not complied with. We reversed on the basis that the administrative rule referred to discharges from the stomach into the mouth and did not require the operator of the test to make certain that the defendant had not coughed and that the officers adequately observed the defendant.

The language from *Hanson*, on which defendant particularly relies, is that:

"Failure to 'make certain' that a suspect does not put anything into his mouth, vomit, or *regurgitate liquid from his stomach* for the required 15 minutes will void the results of the breath analysis because any of those acts may introduce into the mouth traces of alcohol which will contaminate the 'alveolar' (lung) air which breathalyzer equipment is designed to gauge. The approved methods set out by the Health Division in OAR ch 333 *are designed to assure* an uncontaminated breath sample[.]" *Hanson*, 19 Or App at 503. (Emphasis omitted; emphasis supplied.)

As the concurrence correctly notes, the above language is *dicta*. Further, it simply explains that the procedures in the rule were "designed to assure" that an uncontaminated sample is obtained and that *failure to follow the procedures* will void the result. Nowhere in *Hanson* did we say that the procedures must absolutely guarantee that a suspect does not take anything by mouth, vomit or regurgitate and, if a defendant proves that he or she did any of those things during the observation period, it follows, as a matter of law, that the rule was not satisfied.

Our understanding of *Hanson* is confirmed by our holding in a later case, *State v. Lessar*, 105 Or App 512, 805 P2d 730, *rev den* 311 Or 482 (1991). In that case, the defendant challenged the admission of the Intoxilyzer test on the basis that OAR 257-30-020(1)(b) was not satisfied. The defendant relied on the officer's testimony that, although he had

observed the defendant for 15 minutes and was "quite certain" that he did not vomit or regurgitate, he was not certain that the defendant did not put anything in his mouth. The defendant argued that the officer's uncertainty required the conclusion that the requirement of the rule that the examiner "make certain" that nothing was taken by mouth was not met. We concluded:

> "The threshold issue is whether the state has presented a *prima facie* case. The trial court found that the trooper was quite certain that defendant did not vomit or regurgitate during the pertinent 15 minute period. It also found that the trooper had 'observed the defendant in a reasonable manner' and had not observed defendant place anything in his mouth. *We agree with the trial court that absolute certainty is not required by OAR 257-30-020(1)(b) and that the trooper's testimony established a prima facie case.* In the light of the fact that defendant did not present any evidence that he had regurgitated, vomited or taken anything by mouth while he was in the patrol car and during the eight-block ride to the Harney County Sheriff's office, the trial court correctly denied defendant's motion." *Id.* at 517. (Footnote omitted.)

The dissent here ignores the language from *Lessar* that, despite the requirement that the observing officer "make certain" that a subject has not vomited, regurgitated or taken anything by mouth, that "absolute certainty" is not required by the rule. Instead, it reads our decision in *Lessar* and our decision in *State v. Demings*, 116 Or App 394, 841 P2d 660 (1992), *rev den* 315 Or 443 (1993), as supporting its view that the rule imposes an objective standard. Specifically, the dissent relies on the language quoted above, from *Lessar*, that

> "In the light of the fact that defendant did not present any evidence that he had regurgitated, vomited or taken anything by mouth * * * the trial court correctly denied defendant's motion." *Lessar*, 105 Or App at 517.

The dissent also points to similar language in *Demings*. In *Demings*, the observing officer testified that he was not aware of the need to look for regurgitation in the sense of the defendant's having regurgitated liquid from his stomach to his mouth. He did state that he observed the defendant for 30 minutes and that he did not see him take anything by mouth, vomit or regurgitate. The trial court

found that this established a *prima facie* case of compliance with the rule and we agreed. We said:

"It was then incumbent on defendant to place facts in the record which, if true, would demonstrate that official duty in administering the test was not regularly done. *State v. Lessar, supra,* 105 at 515. Defendant offered no evidence that he had regurgitated." *Demings,* 116 Or App at 397.

The dissent reads this language in *Lessar* and *Demings* to mean that if evidence that the defendant had, in fact, taken something by mouth, vomited or regurgitated during the observation period was introduced, that would *automatically* overcome evidence that the observing officer did properly perform the pretest requirements of the rule. Although we did note that the defendants in those cases presented no such evidence and, therefore, the state's *prima facie* showing of compliance was not overcome, we did *not* say that such evidence would *automatically* have overcome the state's evidence of compliance. As discussed above, that will depend on the specific evidence offered. Evidence that shows that a person following the procedures of the rule would have observed the vomiting, etc., could overcome the state's showing of compliance with the rule. However, evidence, such as that presented here, that the regurgitation was silent, was not otherwise noticeable and was not communicated to the observing officer, does not preclude the conclusion that the pretest procedures were complied with.

The trial court here found that the officer correctly administered the Intoxilyzer, complied with all requirements of the administrative rules governing the use of the Intoxilyzer, and, in particular, "made certain" that defendant had not regurgitated any liquid. The evidence supports these findings and, under our reading of OAR 257-30-020(1)(b), the trial court properly concluded that the rule was satisfied. The trial court did not err in denying the motion to suppress.

Affirmed.

**EDMONDS, J.,** concurring.

Pretrial, defendant moved to exclude the evidence of the Intoxilyzer test result on the basis that the state was unable to prove compliance with the applicable administrative rules for the administration of the test, including OAR 257-30-020(1)(b). That regulation reads:

*"Pre-Test Requirement.* The operator must make certain the subject has not taken anything by mouth, (drinking, smoking, eating, taking medication, etc.) vomited, or regurgitated liquid from his stomach into his mouth, for at least 15 minutes before taking the test[.]"

At the hearing on the motion to exclude the evidence, defendant testified:

"Q You're in the Tigard Police Department and they've asked you to blow and —

"A I'd been trying not to cry and it had just been — My throat was constricted, my stomach was constricted and right before he was — I don't know if he was setting up the machine or testing it or what, but he was working with the machine, and I had a little burp — my friends and I always call it something else, but anyway it came up from my stomach into my throat into my mouth and I just swallowed it back down. I didn't think anything of it.

"Q Did it make any noise?

"A No.

"Q How long did you do that before you blew into this machine?

"A A minute and a half, two minutes.

"Q Did Officer Manion [the officer administering the test] at any time ask you if you'd regurgitated liquid from your stomach into your mouth?

"A No, he did not."

Manion testified that he followed the checklist requirements in administering the Intoxilyzer test, including the requirement that he observe defendant for a 15-minute period. He testified:

"Q * * * Okay. Did you hear any sounds from the defendant to indicate anything to you when you were in the intoxilyzer room, anything to you that would indicate that the defendant had something in her mouth?

"A No.

"Q Did you hear anything that sounded like vomiting or regurgitation?

"A No, I did not.

"Q Did you smell anything that smelled like vomit or regurgitation?

"A   No, I did not.

"Q   Were you watching her face during that time?

"A   Yes.

"Q   Why would you do that?

"A   Sometimes when people regurgitate or vomit or burp they make a facial expression that could indicate that. That's why I was looking in her face too.

"Q   Did you see anything to indicate that?

"A   No, I did not."

The trial court denied defendant's motion to exclude the evidence of the Intoxilyzer result. It ruled:

"The result of the Intoxilyzer is admitted. The officer correctly administered the Intoxilyzer. He complied with all the requirements of the OAR. In particular he 'made certain' that defendant had not regurgitated any liquid. Therefore the test result is admissible to help prove the blood alcohol level of defendant's blood at the time she was driving.

"Defendant's testimony that she without any outward or perceptible sign inadvertently brought 'acid' into her mouth, even if believed, does not render the test inadmissible. Her testimony may explain the test result and convince the jury that it does not help them determine the blood alcohol content at the time * * *.

"The OAR requirement addresses the officer's responsibility. He satisfied that. Using all human faculties he made certain. The OAR does not require that the officer make inquiry. This officer had no evidence that would cause any lack of certainty."

The issue before us is whether the trial court erred in ruling that, even if defendant inadvertently "brought acid into her mouth," the test result is still admissible as evidence and that OAR 257-30-020(1)(b) does not preclude that result. The rule was adopted by the Oregon State Police Department (OSP) pursuant to the authority granted by the legislature and ORS 813.160(1)(b). ORS 813.160 provides, in pertinent part:

"(1)   To be valid under ORS 813.300:

"* * * * *

"(b)   Chemical analyses of a person's breath * * * shall be performed according to methods approved by the Department of State Police. For purposes of this paragraph, the Department of State Police shall do all of the following:

"(A)    Approve methods of performing chemical analyses of a person's breath."

ORS 813.300 provides for the use of blood alcohol percentages as evidence in a prosecution for DUII.

The majority holds that if an officer administering an Intoxilyzer test takes every reasonable step to ensure that the test subject has not done anything to contaminate the breath sample, the officer has complied with the rule. It reads our case law to have already decided this issue. Defendant and the dissent rely on our language in *State v. Hanson*, 19 Or App 498, 528 P2d 100 (1974), for the proposition that as a result of what occurred here, the test result was not "valid" under ORS 813.300 and therefore, it is not admissible evidence. I disagree with both positions.

Although there is language in *Hanson* that suggests that a contamination of the breath sample will "void" the result of the test, *id.* at 503, that language is only *dicta* because there was no violation of the rule in that case. Consequently, we did not undertake to decide whether a violation of the rule affected the admissibility into evidence of the test results. Moreover, no subsequent case has decided what happens when the administering officer complies with the requirements of the rule, but in fact, unknown to him, the breath sample is compromised. The majority's reliance on the cases that it cites is misplaced because none of those cases involved arguably credible testimony of the kind that occurred in this case.[1] Accordingly, whether evidence about contamination requires automatic exclusion of the test result under the administrative rule or simply bears on the admissibility of the breath sample as evidence under the Oregon

---

[1] In *Hansen*, there was no evidence that any regurgitation of liquids occurred. The defendant coughed, conduct not covered by the rule or causing contamination of the sample. In *State v. Lessar*, 105 Or App 512, 805 P2d 730, *rev den* 311 Or 482 (1991), the defendant did not present any evidence that he had regurgitated, vomited or taken anything by mouth during the 15-minute observation period. In *State v. Demings*, 116 Or App 394, 841 P2d 660 (1992), *rev den* 315 Or 443 (1993), again the defendant offered no evidence that he had regurgitated. All of our opinions, 138 Or App at 535 n 1, focus on the state's burden to demonstrate *prima facie* compliance with the rule, an issue that is different from the issue of what happens in the event contamination occurs without the knowledge of the administering officer.

Evidence Code (OEC) section 104[2] is an issue of first impression for this court.

"In interpreting a statute or a regulation, our task is to ascertain the intent of the body that promulgated it." *Perlenfein and Perlenfein*, 316 Or 16, 20, 848 P2d 604 (1993). The principles of statutory construction are no less applicable to the construction of administrative rules. *Columbia Steel Castings Co. v. City of Portland*, 314 Or 424, 430, 840 P2d 71 (1992). Therefore, a proper analysis requires us to construe the intent of the administrative body that adopted the rule, in this case, OSP. We begin with the text and context of the statutes and the rule, mindful that it is axiomatic that an agency cannot adopt a rule that exceeds the scope of authority granted to it by the legislature.

OAR 257-20-020(1)(b) was adopted by OSP pursuant to the authority granted to it under ORS 813.300 and ORS 813.160(1). ORS 813.300, when read with ORS 813.160(1)(b), provides: "To be valid under ORS 813.300," a chemical analysis shall be undertaken according to the "methods of performing chemical analysis of a person's breath" approved by OSP. Did the legislature intend by that language to vest OSP with the authority to determine the admissibility of Intoxilyzer test results in a court of law? The text and context of the statutes could be understood to mean that a test is "invalid" for all purposes when not performed according to the "methods" promulgated by the agency. On the other hand, the language may have been meant to vest OSP with the authority to designate what kinds of machines could be used by the agencies and to regulate the operation of those machines by their officers. Accordingly, if an officer perceives that the sample has been contaminated during the 15-minute observation period, the rule requires him to repeat the observation period. When viewed in that light, it is arguable that the language of the statutes and the rule focuses only on the conduct of the officer and is not intended to regulate the admissibility of evidence in a court. Plainly,

___

[2] OEC 104 provides that the preliminary question of admissibility of evidence in a court of law shall be determined by the court. There is no magic about an Intoxilyzer test result that is offered into evidence in court. In concept, it is like any other test result obtained by a procedure performed outside the court and offered as evidence to prove a fact in issue.

the language of the statutes is susceptible to either interpretation.

The second level of inquiry about the legislature's intent involves the underlying legislative history of the statutes. Language similar to what now exists in the statutes originated in Oregon Laws 1965, chapter 574, section 6. That law required the State Board of Health to "approve techniques or methods of performing chemical analyses that are satisfactory for determining alcoholic content of a person's blood." *See also State v. Fogel*, 254 Or 268, 459 P2d 873 (1969) (holding that under *former* ORS 483.644(1), any *machine* used to determine blood alcohol content must be approved by the State Board of Health). Subsequently, in Oregon Laws 1979, chapter 410, section 8, the legislature gave *OSP* the authority to "approve *techniques or methods* of performing chemical analyses of a person's breath." (Emphasis supplied.) There is no indication in any of the predecessor statutes or their underlying legislative history that the legislature intended to do anything more than delegate to the appropriate agency the authority to select the kinds of machines that would be used to perform chemical analysis of a person's breath. I do not question that implied with that grant of authority is also the authority of the agency to promulgate regulations for the operation of the machines by the agency's operators. However, the assertion by the majority and the dissent that the statutes grant additional authority to the agency to determine the admissibility into evidence of the test results in a court of law is not supported by any legislative history that I have read. Because there is no indication that the legislature ever intended for OSP to control what courts could admit into evidence, the majority errs when it vest OSP with authority beyond that expressly and impliedly granted by the legislature.

The text of the rule also supports the interpretation that OSP does not have the authority to control what courts may admit into evidence. OAR 275-30-020(1) applies to breath testing with Intoxilyzer models 4011 and 4011A. Subsection (1)(b) of the rule prescribes the pretest observation requirements that the "operator" of the test must perform. Its focus requires the operator to "make certain" that the subject has not done anything within the 15-minute

period before taking the test that would result in the subject having a substance in his or her mouth that could affect the test result. The rule says nothing about what happens in a court of law under the circumstances of this case when there is conflicting evidence about the validity of the test sample.

In the absence of any authority on the part of the agency to control the admissibility of evidence in a court of law, this case turns on our standards of review regarding the trial court's evidentiary findings and rulings of law. The trial court found that the officer correctly administered the Intoxilyzer, complied with all requirements of the administrative regulations governing the use of the Intoxilyzer, and "in particular, he 'made certain' that defendant had not regurgitated any liquid." We should review the trial court's ruling like any other preliminary ruling involving admissibility of evidence. Because the evidence supports the trial court's historical findings, they are binding on this court. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968).

Nonetheless, defendant appears to argue as a matter of law that the test results are inadmissible as evidence. The trial court concluded that defendant's testimony did not preclude the admissibility of the test sample into evidence but rather went to the weight to be given the test sample by the triers of fact. Defendant's argument poses a threshold inquiry: What rule of law was violated by the court's ruling? Because the statutes and the administrative rule relied on by defendant are inapplicable, she is left with the argument that the trial court erred when it determined that the alleged contamination of the sample did not sufficiently impeach the test result so as to make it inadmissible. Defendant loses that argument also. Although she argues that the prejudicial effect of the test result outweighed its probative value under OEC 403, the kind of "prejudice" contemplated by the rule is not apparent from the record. In sum, the majority's conclusion that the trial court did not err is correct, albeit for the wrong reason.

The issue in this case is not unlike the issue in *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995).[3] At issue in that

___

[3] The majority and the dissent say that the holding in *State v. O'Key* is inapposite because in this case the legislature has delegated the appropriate

case was the admissibility into evidence of a horizontal gaze nystagmus (HGN) field sobriety test result in a DUII prosecution. The state contended that the test was admissible because the legislature had delegated authority to OSP in ORS 801.272 to decide what tests fell within the definition of a field sobriety test. ORS 813.135 provides implied consent by motorists to undergo field sobriety tests as defined by ORS 801.272 to determine if they are operating a motor vehicle while under the influence of intoxicants. The court rejected the state's position, holding:

> "Although the legislature has delegated to the OSP after consultation with the Board on Public Safety Standards and Training, the determination of what constitutes a 'field sobriety test,' the legislature did not delegate to OSP the authority to decide what evidence is admissible in a prosecution for DUII. It follows that approval of the HGN test by the OSP does not mean that the HGN test evidence is admissible." 321 Or at 290.

The court proceeded to analyze the admissibility of HGN test results under the OEC as we should do here.[4]

In summary, defendant's assertion that her testimony automatically requires exclusion of the test results from evidence is not tenable. The trial court was correct when it opined that, even if defendant's testimony were to be believed, it would not render the test results inadmissible. No statute or administrative rule requires that result. Rather, as the trial court correctly noted, defendant's testimony was simply evidence for the jury to consider in determining whether the test result was accurate.

---

authority to OSP to control the admissibility into evidence of the test sample. The holding in *O'Key,* although not controlling, is instructive because it expresses a rationale for determining the admissibility of evidence when there is a delegation of authority to OSP similar to that granted by the applicable statutes in this case.

[4] The majority states that the analysis made in the concurring opinion was not made by the parties, and therefore, it is inappropriate to decide the case on that basis. I disagree because the arguments of the parties necessarily raise the issue of whether OSP's rule controls the admissibility into evidence of the test result. By not expressing the correct analysis and deciding the case on the arguments presented, we perpetuate an incorrect understanding of our case law and the significance of the administrative rule.

For the above reasons, I concur in the lead opinion's result, although not its reasoning.

Warren, J., joins in this concurrence.

**HASELTON, J.,** dissenting.

"Make certain" means make certain. It does not mean, as the majority would have it, "make a reasonable effort." Accordingly, I dissent.

I agree with the majority that violations of OAR 257-30-020(1)(b) necessitate the suppression of breath tests.[1] We differ, however, as to what constitutes compliance with that rule. Although the majority concludes that the administering officer's conformance to certain pretest procedures is sufficient, that result cannot be squared with the rule's plain language and purpose. Rather, the "make certain" requirement of OAR 257-30-020(1)(b) compels suppression of breath test results whenever a suspect has actually regurgitated, compromising the objective integrity of the breath sample.

OAR 257-30-020(1)(b) provides:

> "*Pre-test Requiremen..* The operator must *make certain* the subject has not taken anything by mouth, (drinking, smoking, eating, taking medication, etc.) vomited, or regurgitated liquid from his stomach into his mouth, for at least 15 minutes before taking the test[.]" (Emphasis supplied.)

Our decisions of late have properly cautioned against rote reliance on dictionary definitions. *See, e.g., State v. Holloway*, 138 Or App 260, 265, 908 P2d 324 (1995). Nevertheless, this is one case in which plain meaning, by reference to dictionaries or otherwise, is irresistible. "Certain" means "established beyond doubt or question,"[2] "established as true or sure,"[3] "not to be doubted as a fact,"[4] and "marked by complete assurance and conviction, lack of doubt, reservation, suspicion, or wavering."[5] Moreover, the rule states that

---

[1] The concurrence espouses a qualitatively different analysis. However, I agree with the majority, 138 Or App at 535 n 1, that that analysis is inapposite.

[2] *American Heritage Dictionary of English Language* 220 (1979).

[3] *Random House College Dictionary* 229 (1973).

[4] *Webster's Third New International Dictionary* 367 (Unabridged 1993).

[5] *Id.*

the operator "must *make* certain" that the subject has not regurgitated, not that the operator "*be* certain." Thus, the rule focuses on the objective truth, the certainty, of a particular fact — whether the subject has taken anything by mouth, vomited, or regurgitated during the 15-minute pretest period — and not on the subjective reasonableness of the operator's belief or conduct.

That focus bespeaks the rule's purpose: to assure that Intoxilyzer results are based on "clean" breath samples. To be "valid" for purposes of ORS 813.160,[6] and thus admissible under ORS 813.300,[7] a chemical analysis of a suspect's breath must be performed according to methods approved by the Department of State Police. Thus, OAR 257-30-020(1)(b) was promulgated to ensure the validity of test results:

"Failure to 'make certain' that a suspect does not put anything into his mouth, vomit or *regurgitate liquid from his stomach* for the required 15 minutes will void the results of the breath analysis because any of those acts may introduce into the mouth traces of alcohol which will contaminate the 'alveolar' (lung) air which breathalyzer equipment is designed to gauge. The approved methods set out by the Health Division in OAR ch 333 are designed to assure an uncontaminated breath sample; both vomiting — discharge from the stomach through the mouth — and regurgitation of

---

[6] ORS 813.160 reads, in part:

"(1) *To be valid* under ORS 813.300:

"* * * * *

"(b) Chemical analyses of a person's breath shall be performed by an individual possessing a valid permit to perform such analyses issued by the Department of State Police and shall be performed according to methods approved by the Department of State Police. For the purposes of this paragraph, the Department of State Police shall do all of the following:

"(A) Approve methods of performing chemical analyses of a person's breath.

"(B) Prepare manuals and conduct courses throughout the state for the training of police officers in chemical analyses of a person's breath[.]"

[7] ORS 813.300 provides, in part:

"(1) At the trial of any [proceeding] arising out of the acts committed by a person driving a motor vehicle while under the influence of intoxicants, if the amount of alcohol in the person's blood at the time alleged is less than .08 percent by weight of alcohol as shown by chemical analysis of the person's breath or blood, it is indirect evidence that may be used with other evidence, if any, to determine whether or not the person was then under the influence of intoxicants."

liquids from the stomach into the mouth are likely to result in the presence of residual mouth alcohol which will cause the test results to show an artificially high percentage of alcohol." *State v. Hanson*, 19 Or App 498, 503, 528 P2d 100 (1974) (emphasis in original).

Consistent with that purpose, our cases have held that the state's proof of compliance with various pretest observation procedures can support a presumption that a defendant did not regurgitate during the pretest period and that the test results were thus uncontaminated. *Compare State v. Demings*, 116 Or App 394, 397, 841 P2d 660 (1992), *rev den* 315 Or 443 (1993) (affirming denial of suppression motion where state, by evidence of operator's observation, established *prima facie* case of regulatory compliance and defendant "offered no evidence that he had regurgitated"); and *State v. Lessar*, 105 Or App 512, 517, 805 P2d 730, *rev den* 311 Or 482 (1991) (same) *with State v. McVay*, 83 Or App 312, 731 P2d 466 (1987) (affirming suppression of Intoxilyzer results where operator delegated part of testing procedure to third party and failed to inquire whether the defendant had vomited or regurgitated). Nevertheless, if the rule's plain language and its fundamental "uncontaminated sample" purpose are to be given effect, the state's *prima facie* showing of compliance can, and must, be overcome by credible evidence of actual regurgitation. If the trial court finds that a suspect actually regurgitated during the pretest period, the Intoxilyzer result must be suppressed.

The majority implies that so applying and enforcing OAR 257-30-020(1)(b) would encourage subterfuge and hamstring law enforcement:

"[I]f a subject manages to regurgitate without the observing officer knowing it and later manages to convince the court that this occurred, the court would be required, as matter of law, to conclude that the rule was not complied with and that the results of the Intoxilyzer test were inadmissible." 138 Or App at 535-36.

Those fears are misplaced for at least two reasons. First, before being entitled to suppression, defendants must first convince trial judges that, notwithstanding an officer's adherence to pretest observation procedures, regurgitation did,

in fact, occur. Thus, trial courts' credibility determinations will effectively screen baseless claims of undetected regurgitation.

Second, and in a related sense, officers administering Intoxilyzer tests can engage in observation practices that will buttress the state's *prima facie* showing of compliance. For example, after completing the pretest observation, and before taking the breath sample, the operator can ask whether the subject regurgitated during the observation period. If the response is negative, it will obviously be more difficult for the subject/defendant to credibly claim later that he or she actually regurgitated. Such a procedure is neither unusual nor unworkable. Indeed, Officer Manion indicated that he routinely followed that practice, but inexplicably failed to do so in this case. There is no slippery slope here.

OAR 257-30-020(1)(b) is clear: The operator must make certain that the subject has not regurgitated during the pretest period. If defendant did, in fact, regurgitate, Manion necessarily did not make certain of the converse, and the Intoxilyzer results must be suppressed. Because the trial court did not render a finding as to whether defendant actually regurgitated during the 15-minute pretest period,[8] the judgment should be vacated and the case remanded for appropriate findings.[9]

---

[8] Defendant contends that the trial court found that she regurgitated during the pretest period. She points particularly to the court's remarks during the suppression hearing:

"And your argument is * * * that if you have a historical fact that she did, in fact, regurgitate some material — *and I am prepared to make that finding; I find her believable* — that it's not admissible * * *."

However, in its order denying defendant's suppression motion, the court did not render such a finding. Instead, the court stated, "defendant's testimony * * * *even if believed* does not render the test inadmissible." (Emphasis supplied.) When a written judgment varies from a prior oral ruling, the written judgment controls. *See State v. Swain/Goldsmith*, 267 Or 527, 530, 517 P2d 684 (1974). Thus the trial court did not render a finding as to whether defendant actually regurgitated during the 15-minute pretest period.

[9] The state contends that, regardless of whether defendant actually regurgitated, any error in failing to suppress the Intoxilyzer results was harmless because there was "little, if any likelihood" that the admission of that evidence affected the jury's verdict. *State v. Walton*, 311 Or 223, 231, 809 P2d 81 (1991). The record, however, is to the contrary; the breathalyzer test results were central to the prosecution's case.

I respectfully dissent.

Riggs, De Muniz, and Armstrong, JJ., join in this dissenting opinion.