Argued and submitted May 12, 2021, affirmed March 15, 2023

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JEFFREY BRIAN TRUE,
*Defendant-Appellant.*

Jefferson County Circuit Court
19CR01872; A172287

527 P3d 42

Defendant appeals from a judgment of conviction for driving under the influence of intoxicants (DUII), ORS 813.010(4), arguing that the trial court erred in denying his motion to suppress for two reasons. First, he contends that he was unlawfully seized in violation of the state constitution when a deputy approached and questioned him in his parked vehicle. Second, he argues that the deputy failed to comply with the statutory and administrative regulations when administering a breath test. *Held*: Under the totality of circumstances, the deputy's actions were more akin to an officer seeking cooperation and requesting information than those of an officer intentionally and significantly restraining an individual's freedom of movement through physical force or some show of authority. Further, the breath test was conducted in accordance with the statutory and administrative requirements. Accordingly, the trial court did not err.

Affirmed.

---

Annette C. Hillman, Judge.

Lindsey Burrows argued the cause for appellant. Also on the brief was O'Connor Weber LLC.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

POWERS, J.

Affirmed.

**POWERS, J.**

Defendant appeals from a judgment of conviction for driving under the influence of intoxicants (DUII), ORS 813.010(4), arguing that the trial court erred in denying his motion to suppress. First, he asserts that he was unlawfully seized in violation of the state constitution when the deputy approached and questioned him as he was attempting to order food in a drive-through. Second, he argues that, because the deputy did not comply with the statutory and administrative regulations when administering a breath test, the results of that test should have been suppressed. For the reasons that follow, we conclude that the deputy did not stop or seize defendant when he began the conversation with defendant and further conclude that the manner in which the test was administered did not provide a basis for suppression. Accordingly, we affirm.

We review the trial court's ruling denying defendant's motion to suppress for errors of law. *State v. Maciel-Figueroa*, 361 Or 163, 165, 389 P3d 1121 (2017). In so doing, we are bound by the court's factual findings if there is constitutionally sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Where the court did not make express findings, and there is evidence from which the court could have found a fact in more than one way, we presume that the court decided the facts consistently with its ultimate conclusion. *Id.*

In the following two sections—which correspond to defendant's two arguments—we summarize the facts in accordance with those standards, separately discussing the facts relevant to each argument.

## I.   WHETHER DEFENDANT WAS SEIZED UNDER ARTICLE I, SECTION 9

Shortly after 11:00 p.m. in early January, Deputy Aldred received a complaint about someone in a pickup truck, who was honking, tailgating, and had run off the road and into a field while trying to pass in a no-passing zone. Driving his marked patrol vehicle, Aldred drove toward the reported location and noted that the roads were icy and that the weather was foggy. He located the truck driven by

defendant traveling in the opposite direction. Without activating his overhead lights, Aldred turned around, passed two vehicles, and started following directly behind defendant. He followed defendant's vehicle for about two miles, during which time he did not observe defendant commit any traffic violations. Defendant eventually pulled into a McDonald's drive-through, and Aldred pulled into a parking spot about 50 feet away. Although it was not obvious from viewing the exterior, Aldred knew from past experience that the restaurant was already closed. Parked in one of the drive-through ordering lanes, defendant was at an order box with his window rolled down, apparently waiting to place an order. Aldred, who was wearing a uniform and had his firearm holstered, approached defendant's truck on foot and stood on the curb behind the order box to speak to defendant through the open driver's side window.

    Aldred introduced himself and explained that he was making contact due to a driving complaint and asked if defendant had driven off the road. Defendant admitted that he had run off the road and into a field. Aldred told defendant that the person making the driving complaint had also said that the truck was tailgating and passing in a no-passing lane. Aldred informed defendant that he had followed him to McDonalds, but had not observed any traffic violations, and that he "was just making contact and it wasn't a stop."

    As he interacted with defendant, Aldred observed that defendant had slurred speech and bloodshot, watery eyes. Aldred asked defendant where he was going and where he had come from and further asked if he had been drinking or using other drugs. Defendant answered Aldred's questions, including telling the deputy that he had not been drinking or using drugs. At some point, a second officer arrived and parked nearby but did not activate his overhead lights. As Aldred spoke with defendant, a gust of wind blew towards him, and Aldred smelled alcohol coming from the vehicle. Aldred again asked defendant if he had been drinking, and defendant told Aldred that he had had two beers. From that point on, Aldred believed the encounter turned into a stop.

Aldred asked defendant more questions about the alcohol and asked defendant for his driver's license, which he provided. Defendant declined Aldred's request to conduct a field sobriety test. At that point, Aldred believed he had probable cause to arrest defendant and instructed defendant to step out of his vehicle. When Aldred asked again if defendant would consent to field sobriety tests, defendant changed his mind and agreed to perform the tests. Defendant's performance on those tests indicated to Aldred that he was intoxicated. Aldred read defendant his *Miranda* rights, asked him several questions, and arrested him for DUII and reckless driving. Aldred then transported defendant to the Jefferson County Jail.

Before trial, defendant moved to suppress the evidence obtained during the stop, contending that Aldred unlawfully seized him without reasonable suspicion or probable cause. The trial court denied the motion to suppress, and defendant entered a conditional plea of guilty as provided by ORS 135.335(3) to one count of driving under the influence of intoxicants, ORS 813.010(4), and reserved for appeal the denial of his motion to suppress. The trial court dismissed the reckless driving charge, and defendant timely appealed.

On appeal, defendant argues that the trial court erred in denying his motion to suppress, renewing his contention that he was unlawfully seized when Aldred first approached and questioned him, *viz.*, before Aldred smelled alcohol and developed reasonable suspicion or probable cause. The state remonstrates that Aldred did not seize defendant when he approached him in the McDonald's drive-through but was instead engaged in a mere encounter until the point that Aldred observed that defendant appeared to be intoxicated.

Article I, section 9, of the Oregon Constitution protects individuals from unreasonable searches and seizures.[1]

---

[1] Article I, section 9, provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon probable cause, supported by oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

The Supreme Court has recognized that there are an infinite variety of encounters between law enforcement and individuals, but only some of those encounters implicate the state constitutional protection against unreasonable seizures. Thus, courts refer to three general categories of police-civilian interactions under Article I, section 9: (1) mere encounters; (2) stops; and (3) arrests. *State v. Leiby*, 293 Or App 293, 296, 427 P3d 1141 (2018). The first category allows officers to approach individuals in public places, seek their cooperation, and request information without any constitutional justification. *State v. Backstrand*, 354 Or 392, 400, 313 P3d 1084 (2013). However, where an officer restrains the individual's liberty—either through physical force or through some show of authority—the interaction shifts out of the first category and becomes a stop, which is a type of seizure, or becomes an arrest. *State v. Ashbaugh*, 349 Or 297, 309, 244 P3d 360 (2010). In such cases, the officer's imposition of restraint must be justified by probable cause or reasonable suspicion. *Id.* (explaining that stops generally must be justified by reasonable suspicion that the person has been involved in criminal activity and arrests must be justified by probable cause that the individual has committed a crime).

Here, the parties agree that, before Aldred saw signs of intoxication, he had neither reasonable suspicion nor probable cause. Thus, the issue is whether Aldred, in approaching and questioning defendant when he was in the drive-through, restrained defendant's liberty either through physical force or through some show of authority such that the interaction shifted from a mere encounter to a seizure. We conclude that he did not.

A stop occurs, "(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) whenever an individual believes that (a), above, has occurred and such belief is objectively reasonable under the circumstances." *Ashbaugh*, 349 Or at 303 (internal quotation marks omitted). Importantly, the application of that test is fact specific and requires an examination of the totality of the circumstances. *Backstrand*, 354 Or at 399.

In arguing that his interaction with Aldred constituted a stop, defendant compares the facts of this case to those presented in *Leiby* and argues that, like the defendant in that case, he was seized. In *Leiby*, we evaluated the totality of the circumstances and noted two key aspects of the encounter between the defendant and law enforcement that led us to the conclusion that he was seized. 293 Or App at 298. Neither of those considerations, however, aids defendant's argument in this case.

First, we emphasized the deputy's "dogged pursuit" of the defendant in *Leiby*. *Id*. After making eye contact with the deputy on the roadway, the defendant seemed startled and turned into a parking lot. *Id*. at 294. The deputy followed by turning into another parking lot where he observed as the defendant went through a coffee stand without ordering and then proceeded back onto the roadway. *Id*. The deputy followed and pulled his patrol car back onto the roadway behind the defendant's vehicle. *Id*. at 295. The defendant saw the deputy behind him again and quickly turned into another parking lot and parked. *Id*. Again, the deputy followed. *Id*. In explaining why the deputy's pursuit contributed to the circumstances that led us to conclude that he was seized, we noted that the defendant was "aware of [the deputy's] obvious and open following, [and] eventually relented and parked." *Id*. at 298.

In this case, however, Aldred followed defendant for about two miles before pulling in and parking at the same McDonald's where defendant had stopped in the drivethrough. Although Aldred's pursuit may have been obvious and open, the record is devoid of any indication that defendant was aware that Aldred was following him, much less that he pulled over as a way of relenting to Aldred's pursuit. Further, even if defendant, in the dark and through the fog, had noticed that law enforcement was behind him, there is nothing to support the notion that defendant believed that Aldred was following him specifically. To the contrary, defendant pulled into McDonalds and was attempting to order food, suggesting that he was going about his business (despite the restaurant being closed) without concern for Aldred's pursuit. Accordingly, we view the circumstances here as distinct from the circumstances presented in *Leiby*,

where "both parties knew defendant was aware he was being followed, and that defendant was now 'caught' and must stay to explain himself." *Id*. at 298. Thus, in our view, a reasonable person in defendant's position would not have felt that the two miles that Aldred tailed defendant caused a significant restraint on his freedom of movement given the totality of the circumstances.

The second key aspect that we noted about the encounter in *Leiby* was the deputy's immediate statement to the defendant upon contacting him. After the defendant had relented and pulled over, the deputy approached his vehicle and asked, "Is there any reason or do you want to tell me why you're trying to avoid me?" *Id*. That question strongly implied to the defendant that he had an obligation to explain himself, especially given the choice of the term "avoid." *Id*. When viewed in conjunction with the deputy's "dogged pursuit," which defendant was aware of, it would lead a reasonable person to believe that they were not free to leave. *Id*. at 298-99.

This case is different. Here, defendant was in the drive-through with his window rolled down when Aldred parked about 50 feet away and approached on foot. Aldred explained that he was contacting defendant due to a complaint, and asked if defendant had driven off the road, tailgated, and passed in a no-passing zone. We agree with defendant that Aldred's initial statements and questions would have conveyed to a reasonable person that Aldred was investigating defendant's driving and is a "pertinent consideration in evaluating" whether the encounter was converted into a stop. *State v. Newton*, 286 Or App 274, 283, 398 P3d 390 (2017). As we further explained in *Newton*, however, questions indicating an investigatory focus are not necessarily dispositive. *Id*.; *see also State v. Anderson*, 354 Or 440, 453, 313 P3d 1113 (2013) (explaining that, where the officers' explanation for why they contacted defendant may have conveyed possible suspicion that the defendant was involved in criminal activity, it did not communicate an exercise of authority required for a stop when considering the context including the officers' tone and manner, as well as the duration of the encounter). Additionally, in this case Aldred tempered his questions about defendant's driving by

telling defendant that he had not observed any traffic violations, that he was making contact due to the report he received, and explicitly telling defendant that it was not a stop. In short, the first key aspect that led us to conclude that the defendant in *Leiby* was seized is lacking here, and the second key aspect is less coercive.

Finally, to the extent that defendant's argument relies on *State v. Reyes-Herrera*, 369 Or 54, 500 P3d 1 (2021), we view the facts of that case as distinguishable from this case. As the court explained in *Reyes-Herrera*, not all verbal questioning is equally coercive. *Id*. at 64. The officer in that case questioned the defendant about whether he had purchased drugs and was in possession of drugs, and further requested to search the defendant, all of which created a more coercive situation under the circumstances of that case when compared to Aldred's questions about defendant's driving in this case. When evaluating the totality of the circumstances in this case, Aldred's actions were more akin to an officer seeking cooperation and requesting information than those of an officer intentionally and significantly restraining an individual's freedom of movement through physical force or some show of authority. Aldred tempered his questions as described earlier and explicitly told defendant that it was not a stop. Accordingly, we conclude that defendant was not seized under the circumstances presented in this case and turn to his second basis for challenging the denial of his motion to suppress.

## II.   WHETHER THE BREATH TEST RESULTS SHOULD HAVE BEEN SUPPRESSED

Even if he was not seized for purposes of the state constitution, defendant maintains that the trial court erred in denying his motion to suppress because Aldred did not comply with the statutory and administrative requirements when administering the breath test. We set out the facts applicable to that issue consistent with our standard of review described above.

After transporting defendant to the Jefferson County Jail, Aldred prepared defendant for a breath test. He began by visually inspecting the inside of defendant's mouth to ensure that it was empty. The only thing that Aldred observed

in defendant's mouth was residue from chewing tobacco, which he described as "a couple little strands of chew." Aldred then began the 15-minute observation period. *See* OAR 257-030-0130(2)(a) (requiring the operator to be certain that the individual has not taken anything by mouth, vomited, or regurgitated liquid from the stomach into the mouth "for at least fifteen minutes before taking the test").

During the observation period, defendant asked if he could have water to rinse his mouth:

"[DEFENDANT]:   Can I have some water to rinse out the Copenhagen that was in my mouth?

"DEPUTY ALDRED:   Yeah. We'll have him get you some water.

"[DEFENDANT]:   Yeah.

"DEPUTY ALDRED:   It's probably going to be a little bit. If not, we—I might have to go get it for you because they went and did a round, and that's why they're not here so—

"[DEFENDANT]:   Yeah.

"DEPUTY ALDRED:   —I can't make any guarantees but I'll try to definitely get you some before, okay?

"[DEFENDANT]:   Sure. Yeah. I just didn't want anything else in my mouth when I do this.

"DEPUTY ALDRED:   Well, understandable, and I didn't see anything in there. You got a little bit of a—just kind of the residue stuck in there.

"[DEFENDANT]:   Sure.

"DEPUTY ALDRED:   From using chew it gets stuck in your teeth and stuff."

Defendant asked for a cup of water a second time, but Aldred told him that the machine was ready and that he would get him water upon completing the test. Aldred checked defendant's mouth one last time and then administered the breath test using an Intoxilyzer 8000 machine. Defendant provided the required two breath samples, which revealed a 0.13 blood alcohol content.

ORS 813.160(1) establishes the requirements for a breath test to be valid evidence in a prosecution for DUII and authorizes the Oregon State Police to approve methods of analyzing a person's breath. ORS 813.160(1)(b); *State v. Leinweber*, 313 Or App 404, 409, 494 P3d 973 (2021). The approved methods for performing a chemical analysis of a person's breath on the Intoxilyzer 8000 are set forth in OAR 257-030-0130, which provides, in part:

"(2)   Pre-Test Requirement:

"(a)   The operator is certain that the subject has not taken anything by mouth (drinking, smoking, eating, taking medication, etc.), vomited, or regurgitated liquid from the stomach into mouth, for at least fifteen minutes before taking the test;

"(b)   There is no requirement that the operator be the person who makes observation of the subject. The person performing the Pre-Test Requirement (observation period) need not possess a permit for the testing of alcoholic content of blood;

"(c)   The Pre-Test Requirement (observation period) does not require that the subject rinse the mouth or remove dentures prior to providing a breath sample;

"(d)   The use of a mouthpiece by the subject during the testing sequence does not constitute a violation of the Pre-Test Requirement."

(Boldface omitted.)

Defendant argues that the results should have been suppressed because Aldred violated the rule's pre-test requirement that he be certain that defendant had "not taken anything by mouth" for at least 15 minutes before the test. That is, defendant contends that "taken by mouth" is not limited to the act of placing something in one's mouth during the 15-minute window. Rather, defendant maintains that the rule means a test is invalid when the officer observes the remnants of any substance in the person's mouth prior to the 15-minute observation period and fails to remove it. Thus, in defendant's view, the chewing tobacco residue that Aldred saw in defendant's mouth prior to the observation period invalidates the test and requires suppression of the results.

The test for determining whether an officer has complied with the administrative rule is both subjective and objective. *State v. Barletta*, 188 Or App 113, 116, 71 P3d 166 (2003). First, the officer must form a subjective belief that the subject has not engaged in any of the acts prohibited by the rule, and second, that belief must be objectively reasonable under the circumstances. *Id*. Here, Aldred testified that he checked defendant's mouth prior to the start of the observation period and "didn't see anything in there," but that defendant had "a couple little strands" of tobacco residue stuck in his mouth. Aldred observed defendant for the entirety of the observation period and testified that, during that period, defendant took nothing by mouth. Thus, Aldred was subjectively certain that defendant took nothing by mouth during the observation period, and, in our view, that belief was objectively reasonable under the circumstances.

Context and legal precedent support that view. OAR 257-030-0130(2)(c) provides that "[t]he Pre-Test Requirement (observation period) does not require that the subject rinse the mouth or remove dentures prior to providing a breath sample[.]" Because the primary purpose behind rinsing one's mouth is to remove a substance from the mouth, OAR 257-030-0130(2)(a) and OAR 257-030-0130(2)(c), read together, suggest that the agency did not intend that every particle of foreign substance must be removed from the subject's mouth for the test results to be valid.

Indeed, we made a similar determination in *State v. Goddard*, 87 Or App 130, 741 P2d 540 (1987). In that case, the defendant put chewing tobacco in his mouth while being transported to jail but spat most of it out after arriving. *Id*. at 131. As in this case, the sergeant administering the breath test observed the defendant for more than 15 minutes before the test, the defendant asked to rinse his mouth but was not given the opportunity, and the defendant had bits of chewing tobacco in his mouth when the test was conducted. *Id*. The trial court granted the defendant's motion to suppress. *Id*. On appeal, however, we reversed and explained, "Nothing in the rule requires that a DUII suspect be allowed to rinse his mouth during the pre-test waiting period. In fact, the rule prohibits that." *Id*.

Defendant responds that *Goddard* is either distinguishable or should be overruled. *Goddard* is distinguishable, he argues, because unlike the defendant there, he does not contend that an officer must allow him to rinse his mouth after using chewing tobacco before a breath test—only that Aldred was required to be sure that the tobacco residue was removed—and rinsing his mouth would have been an effective way to do so. Regardless of what the defendant argued, however, *Goddard* stands for the position that a breath test is not invalid because a defendant has bits of chewing tobacco in his, her, or their mouth. Moreover, as we have observed, the purpose of the rule "is to provide the methodology designed to assure that breath test results are accurate. However, there is nothing in the language of the statutes or the rule that provides that the methodology must guarantee that the test results are completely accurate." *State v. Balderson*, 138 Or App 531, 535, 910 P2d 1138 (1996) (emphasis omitted). Accordingly, because we conclude that the breath test was conducted in accordance with the statutory and administrative requirements, we reject defendant's second argument and conclude that the trial court did not err in denying the motion to suppress.

Affirmed.