Argued and submitted September 22; decision of Court of Appeals reversed, judgment of circuit court reversed, and case remanded to circuit court for further proceedings December 9, 2021

STATE OF OREGON,
*Respondent on Review,*

*v.*

SAUL REYES-HERRERA,
*Petitioner on Review.*

(CC 18CR64910) (CA A170594) (SC S068223)

500 P3d 1

A police officer saw defendant taking money from another individual and, suspecting that defendant had been participating in a drug deal, engaged defendant in conversation and ultimately asked for consent to search him. Defendant, who is not a native English speaker, consented, and, in the ensuing search, the officer discovered a quantity of methamphetamine in his pocket. Defendant moved to suppress the evidence of the drugs, arguing that he had been stopped without reasonable suspicion in violation of Article I, section 9, and that the discovery of the drugs was the product of that unlawful seizure. The trial court denied defendant's motion to suppress, concluding that the officer had not stopped defendant and that defendant had consented to the search of his pocket, and it convicted him of the charge of unlawful possession of methamphetamine. *Held*: When the officer approached defendant, questioned him, and asked for consent to a search without reasonable suspicion that he had engaged in criminal activity, the officer seized defendant in violation of Article I, section 9, of the Oregon Constitution, because, in the totality of the circumstances, a reasonable person in defendant's position would have believed that his or her liberty was restricted.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

En Banc

On review from the Court of Appeals.*

Joshua B. Crowther, Chief Deputy Defender, Office of Public Defense Services, Salem, argued the cause and filed the briefs for petitioner on review. Also on the briefs was Ernest G. Lannet, Chief Defender.

Paul L. Smith, Deputy Solicitor General, Salem, argued the cause and filed the brief for respondent on review. Also

_____

* On appeal from Washington County Circuit Court, Eric Butterfield, Judge. 307 Or App 500, 475 P3d 951 (2020).

on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Kelly Simon, Portland, Crystal Maloney, Brooklyn, New York, Alexander A. Wheatley, Portland, and Thomas Stenson, Portland, jointly filed the brief for *amici curiae* ACLU of Oregon and Interfaith Movement for Immigrant Justice, Oregon Justice Resource Center, and Disability Rights Oregon.

WALTERS, C. J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

**WALTERS, C. J.**

Article I, section 9, of the Oregon Constitution protects individuals from being stopped by police who lack reasonable suspicion of criminal activity. In this case, we hold that an officer stopped defendant in violation of that constitutional provision.

## BACKGROUND

We begin with the uncontested facts taken from the transcript of defendant's stipulated facts trial. On a weekday afternoon in September 2018, a Hillsboro police officer, Delepine, drove his patrol car by an alleyway and saw two men walking away from each other. One man was counting money, and, when he saw the officer, the man "put the money in his pocket and kind of put his head down [and] looked a little nervous." The other man—defendant—was walking in the other direction. Delepine believed that the two men had "just done some sort of a hand-to-hand transaction," which he thought was "possibly a drug deal." Delepine then drove into the alleyway, ahead of where defendant was walking, and parked the patrol car. Delepine did not activate his overhead lights or his siren. Instead, he got out of his car, "took a couple steps towards [defendant], waved and said hi."

Delepine was in uniform. He approached defendant and addressed him as he usually did when encountering citizens while on patrol:

> "I will tell the person, you know, you're not in trouble, you're free to leave. Introduced myself. Just try to make it as calm and casual as possible."

Delepine told defendant what he had just observed:

> "I saw this guy—you guys were walking away from each other, looked like you'd just been face to face. This guy was counting his money."

And then Delepine asked defendant: "Like did you buy drugs from this guy[?]" Defendant answered, "no."

From defendant's response, Delepine perceived that defendant seemed to be a "native Spanish speaker" who was having difficulty understanding the questions. Delepine then said, "no drogas," which was his "rough understanding

of 'no drugs' in Spanish." Defendant again responded, "no," and he "patted his pant pockets," which, to Delepine, "kind of made it seem like he understood what was being asked."

Delepine then asked, in English, if he "could search [defendant] for drugs," while, at the same time, "kind of motion[ing] like a search"—that is, gesturing as if he were patting someone down. Defendant responded in Spanish, "sí."[1] Then, while pointing to defendant's pockets, Delepine asked in Spanish, "puedo mirar," which Delepine understood to mean, roughly, "can I look." Defendant again responded, "sí," and "put his hands up on his head."

At that point, Delepine began "controlling" defendant's hands—placing defendant's hands behind his back to immobilize him—and, while doing so, searched defendant's pockets. Delepine reached into the coin pocket of defendant's right front pants pocket and found "two baggies that contained a clear crystal substance" that he believed to be methamphetamine.[2]

Delepine then arrested defendant, and the state charged him with one count of unlawful possession of methamphetamine. Defendant moved to suppress the evidence of the drugs discovered in his pocket, arguing that he had been stopped without reasonable suspicion in violation of Article I, section 9, and that the discovery of the drugs was the product of that unlawful seizure. The trial court denied the motion to suppress, concluding that Delepine had not stopped defendant and that defendant had consented to the search of his pocket. Defendant waived his right to a jury trial, and the court convicted defendant of the charged offense.

On appeal, defendant again argued that he had been unlawfully stopped in violation of Article I, section 9. Alternatively, he argued that Delepine had exceeded the scope of his consent when he reached inside defendant's pants

---

[1] The transcript spells defendant's response, "si," without an accent mark. In the context of the encounter, it is clear that the proper spelling is "sí," with an accent mark, which means "yes" in Spanish, and not "si," without an accent mark, which means "if" in Spanish.

[2] Testing later revealed that the substance was in fact methamphetamine.

pocket to search for drugs. The Court of Appeals affirmed without opinion. *State v. Reyes-Herrera*, 307 Or App 500, 475 P3d 951 (2020). We allowed defendant's petition for review, and, for the reasons that follow, we reverse the decisions of both the trial court and the Court of Appeals and remand for further proceedings.

## ANALYSIS

Article I, section 9, establishes "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure." For purposes of Article I, section 9, a seizure occurs when (1) a law enforcement officer intentionally and significantly interferes with an individual's liberty or freedom of movement; or (2) a reasonable person, under the totality of the circumstances, would believe that his or her liberty or freedom of movement has been significantly restricted. *State v. Ashbaugh*, 349 Or 297, 316, 244 P3d 360 (2010).

When an officer takes "physical action that could be construed as threatening or coercive," or takes a physical position that would suggest to a person that he or she is surrounded, the officer seizes the person. *Id.* at 317; *see State v. Rodgers/Kirkeby*, 347 Or 610, 627, 227 P3d 695 (2010) (illustrating the tactic). But it also "is possible to restrict a person's liberty and freedom of movement by purely verbal means[.]" *Ashbaugh*, 349 Or at 317. A verbal encounter rises to the level of a seizure "when the content of the questions, the manner of asking them, or other actions that the police take (along with the circumstances in which they take them) would convey to a reasonable person that the police are exercising their authority to coercively detain the citizen." *State v. Backstrand*, 354 Or 392, 412, 313 P3d 1084 (2013). For an encounter to constitute a seizure, "something more than just asking a question, requesting information, or seeking an individual's cooperation is required." *Id.* at 403. The "something more" can be such things as the content or manner of questioning or the accompanying physical acts by the officer, if those added factors would reasonably be construed as a show of authority requiring compliance with the officer's request. *Id.* That inquiry is necessarily fact-specific

and requires the court to examine "the totality of the circumstances." *Id.* at 399.

Here, defendant argues that Delepine did "something more" than asking defendant a question and seeking his cooperation. Defendant asserts that Delepine accused defendant of committing a crime—or at least indicated that defendant was the subject of a criminal investigation—and he contends that, in those circumstances, reasonable people would believe that they must remain where they were and respond. Defendant cites decisions from this court that, in his view, demonstrate that a seizure occurs in those circumstances.

The state agrees that, if an officer accuses a defendant of committing a crime and questions the defendant about that crime, the officer effects a stop. However, the state contends, an officer does not seize a person when the officer does not actually make an accusation, but, instead, asks questions to gain an understanding of the present circumstances. The state asserts that that is so even if the officer suspects the person of committing a crime. Like defendant, the state cites our decisions for the line that it draws, but the state argues that the facts in this case fall on the "mere conversation" side of that line.

Given those arguments, it is essential that we review the cases on which the parties rely, consider the factors that led this court to the conclusions that it reached, and apply those factors here. Before we do so, however, we pause to note two other arguments that defendant makes, but that we need not address today. First, defendant anticipates an argument from the state that an officer can dispel an individual's reasonable belief that the individual is obligated to remain to answer questions in what would otherwise be considered a stop by informing the individual that he or she is "free to leave." Defendant contends that, if the state intends to rely on such advice, then the state has the burden to establish, among other things, that the individual heard and understood that advice. Here, defendant submits, the state cannot meet that burden because defendant is a non-English speaker and the record establishes that he would not have understood any statements on which the

state might rely to establish that he was adequately advised that he was free to leave. Second, defendant urges us to consider his language, race, and culture in deciding what a "reasonable person" in defendant's position would believe about whether the person's liberty was constrained. Defendant observes that "a reasonable minority person—especially one who does not speak English—might view even 'a casual and nonconfrontation[al]' encounter initiated by police through an entirely different lens." We do not foreclose those arguments, but, for the following reasons, we decline to consider them here.

Defendant's first argument is not implicated here, because, in arguing that Officer Delepine did not stop defendant, the state does not rely on Delepine's testimony that, when he initially approached defendant, he told defendant that "you're not in trouble, you're free to leave." Instead, the state characterizes the issue in this case as dependent on whether, after that initial statement, Delepine accused defendant of a crime or, instead, questioned him in a non-confrontational manner. We also need not consider defendant's second argument because, as we said in *State v. K. A. M.*, 361 Or 805, 810, 401 P3d 774 (2017), "the stop inquiry requires an evaluation of the totality of the circumstances," and, as in *K. A. M.*, "circumstances other than [defendant's language, race, and culture] lead us to conclude that he reasonably perceived that he was not free to leave."

We turn, therefore, to the cases that the parties cite, and begin with *Ashbaugh*, which is the primary case on which the state relies and a case that defendant acknowledges that he must distinguish. In *Ashbaugh*, an officer had just arrested the defendant's husband and approached the defendant to tell her that her husband had asked if she would take his belongings with her. During that noninvestigatory conversation, the officer also asked the defendant, "on impulse," if she had anything illegal in her purse. 349 Or at 302. When she said that she did not, the officer asked if he could search her purse, and the defendant replied, "Yeah, sure." *Id*. The court determined that the officer had not seized the defendant, concluding, with brief discussion, that the officer's request was not accompanied by any physical

action that could be construed as threatening or coercive, that the conversation was "relaxed and nonconfrontational," and that an objectively reasonable person in the defendant's circumstances would not believe that the officer had intentionally and significantly restricted or interfered with her liberty. *Id.* at 317.

The state argues that the facts here are indistinguishable. The state characterizes the facts as showing that Delepine approached defendant, explained what he had observed, and, rather than accusing defendant of having illegally purchased drugs, asked a question and sought defendant's cooperation. The state submits that whether Delepine's questioning amounted to an accusation was a question of fact that we must assume the trial court decided against defendant when it denied his motion to suppress.

The state is certainly correct that this court is bound by the trial court's findings of historical facts when there is constitutionally sufficient evidence to support them. *State v. Maciel-Figueroa*, 361 Or 163, 165-66, 389 P3d 1121 (2017) (so stating). The state also is correct that we must assume that the trial court decided historical facts necessary to its legal conclusions in a manner consistent with those conclusions. *See Pereida-Alba v. Coursey*, 356 Or 654, 671, 342 P3d 70 (2015) ("[W]e presume that a trial court implicitly resolves factual disputes consistently with its ultimate conclusion."). However, if an implicit factual finding is not necessary to a trial court's ultimate conclusion, then that presumption does not apply. *Id.* And, in any case, the question of whether the historical facts establish that a defendant was seized is a question of law on which no deference to the trial court is required.

Whether the intermediate characterization of historical facts—for instance, whether the questions asked did or did not amount to accusations—is a legal or factual determination may be an interesting question, but, here, we need not reach it. We do not agree with the state that the line between relaxed conversation and coercive questioning depends on whether a court determines that an officer made a declarative statement or asked a question, or whether the officer's comments fit the textbook definition of an

accusation. Rather, the critical question, as we articulated it in *Ashbaugh*, depends on the totality of the circumstances and the extent to which those circumstances would lead reasonable people to believe that their liberty or freedom of movement has been significantly restricted. 349 Or at 316. The following cases demonstrate that this court considers myriad factors in making that legal determination and that a seizure may occur even when an officer does not accuse an individual of having committed a crime.

In *State v. Warner*, 284 Or 147, 165, 585 P2d 681 (1978), the court concluded that officers seized the defendant when they informed him that they were investigating an armed robbery, asked him to place his identification on a table, asked him questions related to the robbery, and told him that, once they had "clear[ed] this matter up[,] they would be on their way." Although the officers certainly suspected that defendant had committed the robbery, they did not explicitly accuse him of having done so, and this court did not justify its conclusion that they had seized the defendant on that basis. *Id*.

In *State v. Hall*, 339 Or 7, 115 P3d 908 (2005), the officer who questioned the defendant also did not accuse the defendant of having committed a crime, nor did the officer verbally indicate that the defendant should remain for questioning. Nevertheless, this court concluded that a reasonable person in the defendant's position would not feel free to leave and that the officer had stopped him. The court reasoned that the officer had indicated to the defendant that he was being subjected to a warrant check and explained that reasonable people would not feel free to leave during the time that they were "the investigatory subject" of such a check. *Id*. at 19.

In *State v. Stevens*, 364 Or 91, 430 P3d 1059 (2018), this court held that officers who were conducting a warrant check of one of the passengers in a car, Shaw, also had seized the defendant, another passenger in the car. The questioning officer had stopped the car for a traffic infraction, and, while the officer was processing the stop, he asked the defendant to confirm Shaw's identity. *Id*. at 94. That questioning, the court said, did not constitute a seizure: "As

*Backstrand* explained, officers are free to ask citizens for information without mere conversation becoming a seizure." *Id.* at 101. However, the court continued, the officer did not stop there; the officer's questions and actions "became increasingly coercive." *Id.* After the officer learned that the defendant was on parole, he told her that, if she had been lying about Shaw's name, "there's going to be trouble for you *** potentially through your [parole officer]." *Id.* at 94. The court concluded that, at that point, the officer had seized the defendant, because the defendant "reasonably perceived from [the officer's] show of authority that she was not free to leave until Shaw's true identity and warrant status were determined." *Id.* at 102. In reaching that conclusion, the court also rejected the state's argument that the defendant's conduct—appearing to walk away—meant that she knew she was free to leave. The court explained that, although the officer had not explicitly told the defendant that she had to remain where she was, the officer, on seeing the defendant apparently walking off, had asked her for consent to search her backpack, thereby communicating that she was not free to go. *Id.* at 103.

Another illustrative case is *K. A. M.* There, five Medford police and probation officers entered a known "drug house" with the owner's permission to look for parole violators. 361 Or at 807. One officer entered a bedroom and found two young people who both appeared to be under the influence of a stimulant. He told the young woman that she "need[ed] to stay off the meth," and then asked both her and the youth their names and whether they had anything illegal on them. *Id.* at 811. This court held that both the officer's "unexplained entry into that private space and his accusation that the young woman was using or had recently used methamphetamine created a coercive atmosphere that reasonably conveyed that she and [the] youth were suspected of illegal drug use and were not free to leave until [the officer] had completed his inquiry." *Id.* Significantly, the court did not hold, in *K. A. M.* or in any of the other cases discussed above, that questioning short of accusation does not effect a seizure. Rather, the court considered the totality of the circumstances and whether the questioning as a whole was so coercive that reasonable people would

believe that their freedom of movement had been significantly restricted.

We know, of course, from *Ashbaugh* and *Backstrand*, that not all verbal questioning is equally coercive, and the state cites two additional cases for the proposition that this case falls on the nonrestrictive side of the line. Those two cases are *State v. Anderson*, 354 Or 440, 313 P3d 1113 (2013), and *State v. Highley*, 354 Or 459, 313 P3d 1068 (2013). This court decided both of those cases in conjunction with *Backstrand* and, in each case, reiterated the holding in *Backstrand* that a "mere request for identification made by an officer in the course of an otherwise lawful police-citizen encounter does not, in and of itself, result in a seizure." *Backstrand*, 354 Or at 409-10; *Anderson*, 354 Or at 451 (same); *Highley*, 354 Or at 468 (same).

In *Anderson*, three police officers were executing a search warrant at an apartment when an officer observed that the defendant and another person had walked up to the apartment and "peeked" inside, and then, when they saw officers searching the living room, they "briskly walked back to the car" and got inside it. 354 Or at 443. Three officers then approached the defendant's car and asked him about his interest in the apartment. One of the officers, Zavala, "explained to the driver that the officers were executing a search warrant at the apartment and that they were contacting them 'to find out who [the defendant and the driver] were, what interest they might have had with what [the police] were doing there, or maybe they knew the *** individual that lived there.'" *Id*. Even though the information Zavala had provided to the defendant "objectively conveyed possible suspicion that the *** defendant could be involved in criminal activity related to the apartment," the court held that no seizure had occurred. *Id*. at 453. The court noted that there was no indication that the officers' tone or manner were overbearing or controlling and the content of the brief verbal exchange was not coercive: "Zavala's explanation of the officers' reasons for the contact and the officers' requests for identification informed defendant and the driver that the officers were interested in why they had come to the apartment and what they knew about

[apartment resident's] activities. That information objectively conveyed possible suspicion that the driver and defendant could be involved in criminal activity related to the apartment, but they equally conveyed that the officers were interested in whatever information the two might be able to provide." *Id*. The court characterized the circumstances described in *Anderson* as falling "into the large category of cases in which police officers approach and question persons sitting in parked vehicles without triggering constitutional protections against unreasonable seizures." *Id.* at 454.

In *Highley*, an officer had approached the driver of a parked car because the officer had recognized the driver and knew that his license had been suspended. The defendant had been a passenger in the car, and, during the officer's questioning of the driver, the defendant remained nearby, choosing to "mill" about the car. 354 Or at 461. The officer asked the defendant for his identification and the court held that that request did not amount to a seizure: "That request was, as we conclude in *Backstrand* and reaffirm in *Anderson*, a straightforward request for information and cooperation of the kind that this court, since [*State v.*] *Holmes*, [311 Or 400, 813 P2d 28 (1991),] has continued to affirm police officers may make without implicating Article I, section 9." 354 Or at 469. The same, the court said, was true of the actions that followed—the officer's retention of the defendant's license for a reasonable time to confirm his identity and probationary status, and the officer's request for the defendant's consent to search him. The officer had "confirmed that [the] defendant was not on probation—information that reasonably conveyed that [the officer] was not exercising authority over [the] defendant's liberty." Further, the court said, the defendant remained at the scene and "voiced his willingness to cooperate" when the officer requested consent to a search. Consequently, the court held, the officer's request for consent and further verbal inquiries during the ensuing search did not make the encounter a seizure. *Id.* at 470-71.

It is now our task to decide whether this case is more like the cases in which this court has held that verbal questioning amounts to no more than relaxed conversation and does not constitute a seizure or more like those in which

this court has found a more coercive atmosphere and has held to the contrary. For the following reasons, we reach the latter conclusion.

In this case, the uncontested facts show that Delepine, who was in uniform, parked his car in an alley, got out to investigate what he believed could be a possible "drug deal," and approached defendant, who also was on foot. Delepine told defendant that he had observed defendant walk away from a conversation with another man who was counting money and asked defendant whether defendant had purchased drugs from the man and whether he was in possession of drugs. When defendant twice answered "no," Delepine asked to search him. Those facts distinguish this case from those in which we concluded that individuals were not seized.

First, this case is different from *Ashbaugh* in that, when Delepine approached defendant, he did not explain, as did the officer in *Ashbaugh*, that he had a noninvestigative purpose for doing so. Instead, Delepine told defendant that he had seen defendant walk away from a conversation with a man who was counting money and asked defendant if he had purchased drugs from that man. That exchange conveyed that Delepine suspected defendant of criminal activity. Second, this case is different from *Backstrand*, *Anderson*, and *Highley* in that Delepine did not query defendant about his identity and ask for his cooperation; Delepine asked questions indicating that defendant himself was the subject of a criminal investigation.

Conversely, this case is similar to cases in which the court held that seizures had occurred. The inquiry that Delepine conducted here was similar to the robbery investigation in *Warner* and the warrant investigation in *Hall*. Delepine suspected a possible "drug deal" and questioned defendant to investigate that suspicion. And, like the officer's questioning and request for consent to search in *Stevens*, Delepine's questions to defendant—asking whether defendant had purchased drugs from a man who was walking away counting money and asking whether he had drugs on him—carried an implication that defendant could be in trouble and must remain where he was. That implication

was compounded when, after defendant answered "no" to both questions, Delepine requested defendant's consent to search him. Delepine's questions about whether defendant had purchased or was in possession of drugs also makes this case similar to *K. A. M.* There, an officer told the youth's companion that she "need[ed] to stay off the meth," an indication, the court said, that she and the youth "were suspected of illegal drug use." 361 Or at 811. Here, Delepine's questioning indicated a similar suspicion.

It is true, as the state points out, that this case is different from *K. A. M.* in that, there, the questioning occurred in a private residence and, although only one officer was present in the bedroom where the youth was questioned, other officers also were present in other rooms of the residence. Here, only one officer was present in the public place where the encounter occurred. Such distinctions may be relevant when a court considers the totality of the circumstances, but no one fact is determinative, and context is critical. For instance, we can imagine circumstances in which this court could conclude that reasonable people who were asked noncoercive questions after permitting police to enter their homes would not believe that their liberty was restricted.

As is typical, this case is not on all fours with any other case that this court already has decided. We understand the parties' interest in having us set out a bright line between noncoercive conversation and "something more" restrictive. But the variations in encounters between law enforcement and the public are many, and a slight difference in circumstances could make what was considered a nonrestrictive encounter in one case a stop in another. Even if we think we can make out a bright line, future cases may show more shade than we currently appreciate.

Article I, section 9, of the Oregon Constitution protects the people's right to move freely in the world, with assurance that their liberty will not be significantly restrained without reasonable suspicion that they engaged in criminal activity. Here, the state does not contend that Officer Delepine had that reasonable suspicion. Acting on no more than a hunch, Delepine approached defendant and

subjected him to questioning that, we conclude, would cause reasonable people to believe that they must remain where they are and respond. Whether or not the questions that Delepine asked defendant can be characterized as accusing him of committing a crime, the totality of the circumstances was such that reasonable people in defendant's position would have believed that their liberty was restricted. We hold that defendant was seized and that the trial court erred in denying his motion to suppress.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.