**\*\*\* FOR PUBLICATION IN WEST'S HAWAI'I REPORTS AND PACIFIC REPORTER \*\*\***

**Electronically Filed
Supreme Court
SCWC-22-0000464
22-JUL-2025
10:59 AM
Dkt. 27 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAI'I

---o0o---

STATE OF HAWAI'I,
Petitioner/Plaintiff-Appellee,

vs.

ERIK WILLIS,
Respondent/Defendant-Appellant.

SCWC-22-0000464

CERTIORARI TO THE INTERMEDIATE COURT OF APPEALS
(CAAP-22-0000464; CR. NO. 1CPC-20-0000887)

July 22, 2025

RECKTENWALD, C.J., McKENNA, EDDINS, GINOZA, AND DEVENS, JJ.

OPINION OF THE COURT BY RECKTENWALD, C.J.

## I.    INTRODUCTION

Erik Willis was convicted of attempted murder for the sudden, unprovoked stabbing of the complainant while she was sunbathing on a beach.  The main issue at trial was whether Willis was the person who committed the stabbing.  Willis

appealed, arguing inter alia that the Deputy Prosecuting Attorney (DPA) committed prosecutorial misconduct by misstating evidence before the jury in closing. The Intermediate Court of Appeals (ICA) vacated Willis's conviction and remanded the case for a new trial. The ICA agreed with Willis that the DPA's statements constituted prosecutorial misconduct and, measuring the nature of the misconduct against the weight of the evidence, concluded that there was a reasonable possibility that the DPA's statements contributed to Willis's conviction.

The State now asks this court to reverse the ICA and affirm Willis's conviction. The State argues that the DPA's arguments were based on reasonable inferences from the evidence presented. Even if the statements were improper, the State contends that they were harmless beyond a reasonable doubt. Put otherwise, the State argues that, taken in the context in which they were presented, there is no reasonable possibility that the DPA's statements could have contributed to Willis's conviction.

We agree with the State that the DPA's remarks in closing did not rise to the level of prosecutorial misconduct. The DPA's challenged comments, viewed in context, were based upon reasonable inferences from the evidence adduced at trial. We further hold that there is no reasonable possibility that these comments from the DPA alone might have affected the trial's outcome.

Accordingly, we vacate the ICA's July 1, 2024 Judgment on Appeal and affirm the Circuit Court of the First Circuit's (circuit court) July 20, 2022 Amended Judgment of Conviction and Sentence for Attempted Murder in the Second Degree.

## II. BACKGROUND

### A. Factual Background

On July 8, 2020, 17-year-old M.K. was sunbathing alone on Kahala Beach when an unknown assailant pinned her down from behind, covered her mouth, and stabbed her in the neck repeatedly. She sustained life-threatening injuries as a result of the incident, but fortunately survived.

In the days following the attack, the Honolulu Police Department (HPD) recovered surveillance video footage from a residence at 4671 Kahala Avenue. The footage, recorded from 1:26 p.m. to 1:27 p.m. on July 8, 2020, depicted a person of interest with dark hair, a white t-shirt, tan pants, and black shoes with white markings walking on an access path towards Kahala Beach in proximity to where M.K. was attacked. M.K. would later identify the person depicted in the video as her assailant.

In addition to the footage from 4671 Kahala Avenue, HPD also recovered footage appearing to depict the same person of interest arriving by city bus to the Kahala neighborhood shortly before M.K.'s attack on the afternoon of July 8, 2020.

HPD identified the person in the bus footage as Defendant Erik Willis.

On July 11, 2020, HPD conducted a warrantless arrest of Willis at his residence. Officers entered the residence without permission, detained Willis, and recovered physical evidence, including a pair of black shoes and a white t-shirt.

On July 24, 2020, an O'ahu Grand Jury indicted Willis for the offense of attempted murder in the second degree under Hawai'i Revised Statutes (HRS) §§ 705-500 (2014), 707-701.5 (Supp. 2018), and 706-656 (2014).

**B.    Circuit Court Proceedings[1]**

**1.    Pretrial motions and prior appeal**

On November 16, 2020, Willis filed a motion to dismiss the indictment, a motion to suppress M.K.'s identification of Willis as her assailant, and a motion to suppress evidence and statements obtained pursuant to the warrantless entry and search. The circuit court denied the motion to dismiss the indictment and the motion to suppress identification, but granted the motion to suppress the evidence and statements obtained at the time of Willis's arrest. The State appealed and this court affirmed the circuit court's order suppressing evidence in State v. Willis (Willis I), 150 Hawai'i 235, 500 P.3d

---

[1]    The Honorable Kevin A. Souza presided over the circuit court proceedings.

420 (2021), holding that "[b]ecause the police entered Willis's home without exigent circumstances, permission, or a warrant, the circuit court correctly suppressed the evidence and precluded its use at trial."  Id. at 241, 500 P.3d at 426.  We remanded the case for trial.  Id.

### 2.  Trial

The physical evidence recovered from Willis's residence having been suppressed, much of the State's case against Willis at trial was based on circumstantial evidence in the form of witness testimony and surveillance video that tied Willis to the scene of the attack.  Among the witnesses called by the State were: Corporal Matthew Motas, the HPD officer who initially identified Willis from the bus surveillance footage; Taylor Gray, who was on the beach near M.K. at the time of the incident; Edward Leal, a landscaper who was working on a property at 4635 Kahala Avenue near the site of the stabbing; and M.K. herself.  For its part, the defense put on no evidence and called no witnesses.  Willis himself did not testify.

### a.  The State's case against Willis

The State called Corporal Motas, who had previously mentored Erik Willis for a period between September 2015 and January 2016.  By coincidence, Corporal Motas had also assisted in the investigation of M.K.'s stabbing.  Motas identified Willis in State's Exhibit 2, surveillance footage taken from the

city bus on July 8, 2020. When asked how he was able to identify Willis in the videos, Motas answered, "[f]acial features, body structure, hair," adding, "Defendant has a very prominent brow."

The DPA questioned Corporal Motas about each of the surveillance videos the State entered into evidence. In addition to the videos taken from the city bus, which showed Willis travelling from Niu Valley to Kahala and back, Corporal Motas also identified Willis in State's Exhibits 1 and 10, two surveillance videos taken from a private residence at the intersection of Halemaumau Street and Haleola Street, which Motas recognized to be near Willis's residence. When viewing those videos, recorded in the early afternoon on July 8, 2020, Corporal Motas described Willis as wearing "[a] white shirt, khaki pants, black shoes with white markings on the sides, and a blue medical mask." In a third video submitted as State's Exhibit 6, recorded from the same Niu Valley residence later that day at 4:35 p.m., Corporal Motas observed that Willis was wearing the same clothing but that Willis's white shirt now appeared to have a large stain "across the whole front of it."

Corporal Motas also identified Willis in State's Exhibit 5, surveillance video taken from 948 Pueo Street in Kahala, near where Willis boarded the city bus to return to Niu Valley. The 948 Pueo Street video, recorded on July 8, 2020

from 3:56 p.m. to 4:00 p.m., showed a man who Motas identified as Willis stepping off the street to linger in a driveway for several minutes before moving on.  When asked to describe Willis's clothing in the Pueo Street video, Corporal Motas answered, "[k]haki pants, the black shoes with the white markings, and a dirty white shirt, blue medical mask."

The State also introduced surveillance video marked as State's Exhibit 3, showing a person of interest walking down the beach access adjacent to 4671 Kahala Avenue, and another, State's Exhibit 4, showing a shirtless man running across an empty lot to a construction sink next to 4635 Kahala Avenue, down the beach from where M.K. was attacked.  Corporal Motas was not able to identify the individual depicted in either video.

The State also called Taylor Gray.  Gray testified that, sometime after 1:00 p.m. on the afternoon of July 8, 2020, she was laying on Kahala Beach when she noticed what she thought was a couple being intimate behind a bush to her left.  At some point, a man popped up from behind the bush.  Gray described him as "a hapa-looking man with fluffy, dark hair . . . wearing a blue disposable mask and a white [t]-shirt with what looked like something . . . on the center of his shirt."  Gray briefly looked down and when she looked again the man was running down the beach in the 'Ewa direction.  As the man ran away, Gray noted that he was wearing "long pants."

7

Gray then testified that, after the man ran off, a girl got up from the area of the beach where the man had just been. The girl was M.K. M.K. then approached Gray for help. Gray testified that M.K. was "holding the side of her neck" as she approached, and "pointing down the beach to where the man ran." Gray then ran in the opposite direction to get help from a group of women up the beach. She returned with one of the women who helped her tend to M.K. Gray then called 911. It was 1:47 p.m.

On the second day of trial, the State called Edward Leal. Leal is a landscaper who, on July 8, 2020, was working at 4635 Kahala Avenue, a beachfront residence just a few lots 'Ewa of where M.K. was attacked. Leal testified through an interpreter that, at some time between 1:00 p.m. and 2:00 p.m., he saw a "white guy" with wavy hair wearing light-colored pants and no shirt run through the vacant lot next to 4635 Kahala Avenue. Leal saw the man stop to wash off at a construction sink before running off the lot. When asked what the man was washing at the sink, Leal answered, "He was washing his arms, here, and also wash his face a little." Leal did not identify the man and at no point in his testimony did he mention seeing blood.

The DPA then played the video from 4635 Kahala Avenue. The clip, recorded at 1:46 p.m. on July 8, 2020, showed a man

with dark hair, no shirt, tan pants, and dark shoes run onto the lot adjacent to 4635 Kahala Avenue from the direction of the beach.  The man in the video runs to the sink, appears to wash himself off, and then runs off of the lot.  Leal confirmed that the man in the video was the same person he had described in his testimony.

The State later called M.K. to the stand, where she recounted the stabbing attack in detail.  M.K. testified that she arrived at Kahala Beach via access 133C, which is adjacent to 4671 Kahala Avenue, sometime around 1:20 p.m. on July 8, 2020.  After she had picked a spot to lay out her pareo, M.K. noticed a man walking toward her on the beach.  The man walked past her and sat down on the beach nearby, "about two car lengths away."  She described the man as having brown, poofy hair and wearing a white t-shirt, light-colored jeans, and a blue clinical mask.  She also noted his eyes and "his bushy eyebrows."

Some five minutes after the man in the white t-shirt had walked past her, M.K. laid down on the beach on her stomach. Sometime after she laid down, she felt a hand cover her mouth and a weight on her back.  Then, something sharp stabbing into her neck.  Unable to speak or move her body, M.K. attempted to block the attack with her hands as she was stabbed repeatedly. M.K. estimated that she was stabbed fifteen times before the

attack relented and she felt the weight lift off her back.  M.K. further testified that, as soon as she was able to move, she turned to look in the 'Ewa direction and saw the man in the white shirt running away.  She saw no one else on that stretch of the beach.

M.K. confirmed that, in the days after her attack, she had identified the man depicted in the surveillance video taken from 4671 Kahala Avenue as her assailant.  M.K. then identified Willis in the courtroom as her assailant.  On cross, M.K. confirmed that she had previously identified Willis at a pretrial hearing on January 28, 2021.

### b.    Defense motions for judgment of acquittal

At the conclusion of the State's case in chief, the defense moved for judgment of acquittal, contending that "in this case there is reasonable doubt as a matter of law."  The circuit court denied the motion, finding that "a reasonable mind could indeed conclude defendant's guilt beyond a reasonable doubt."  Willis declined to testify and the defense rested its case without presenting any evidence.  After the jury was dismissed, the defense renewed its motion for judgment of acquittal, which the circuit court denied.

### c.    Closing arguments

The DPA's closing argument began with a summary description that focused on the brutality of the alleged crime.

He then began reviewing each of the State's exhibits and recounting witness testimony to present the State's narrative as to what occurred on July 8, 2020.  The DPA used video evidence to argue that Willis took the bus from his home in Niu Valley to Kahala Beach, where he attacked M.K., cleaned up at the sink in the nearby vacant lot, and disappeared for roughly two hours before resurfacing in soiled clothing and taking the bus back home.

The DPA made the following statements in the course of his argument:

> Taylor Gray said when she saw the man who was on [M.K.]'s back get up, she took a look at him, she saw him, saw part of him, but she noticed that there was something on his white shirt.  She didn't explain what it was, but there was something on the white shirt.  But up to this point, there's been nothing on the defendant's white shirt.  So what could it be?  Blood?  There was plenty of blood.  Sand?  It's on a beach.  We don't know.

> But if you're the defendant, what do you do if you have blood on your shirt?  What do you do if you have blood on your hands?

At this time, the DPA showed State's Exhibit 4, the video footage of the person of interest washing their hands in the vacant lot next to 4635 Kahala Avenue.  The DPA narrated to the jury as the footage played:

> Ladies and gentlemen, this is State's Exhibit 4.  And the time is 1:46:22.  First of all, before we go, notice <u>defendant is here</u>.  No shirt because it's soiled.  Pants, light colored pants.  Shoes, looks like some sort of marking on the side of it.

> Okay.  Please run it to 1:46:43 and then stop it.  Okay.  Stop.

11

Notice something in his left hand.  Looks white.
Most likely it's his shirt.

Go to [1:46:]45 please.

You notice he's turning, leaving the sink, and he's
got something behind his back curled up.  It's white.
State submits that's his shirt.  So we don't know whether
he washed the shirt at the sink, but we know from Edward
Leal that he washed his hands and his face because he had
blood on them.

(Emphases added.)

No witness had identified the person depicted in
State's Exhibit 4 as the Defendant, Erik Willis.  Further,
Edward Leal had not testified to seeing blood on the man washing
at the sink.

Shortly thereafter, the DPA replayed State's Exhibit
6, the video showing Willis walking back toward his residence
after returning to Niu Valley, and argued the following:

Now we're going to show you the surveillance video
again from 5605 Haleola Street at 4:35 p.m.

Now, the defendant, as we previously stated, had
gotten off the bus at around 4:26 p.m.

So just play it.

So watch carefully when the defendant walks by.

Stop.

Shirt is soiled. So what happened was that after the
defendant arrived to the beach with a clean white T-shirt,
after he stabbed [M.K.], he got blood on it, possibly sand.
Tried to wash it out, and disappeared for two hours.

So what to do?  The defendant is on the beach.  He's
targeted [M.K.]  He's on an isolated portion of the beach.
He stabs her repeatedly.  Then he stops and he gets up and
he looks and he sees that Taylor Gray is looking at him.

So what does he do?  He runs.  He runs down the
beach.  He runs up the vacant lot.  He has to clean up.
You run away, you clean up, you hide and wait.  So he ran

12

away, he cleaned up.  Now he has to hide and wait.  This is the two-hour gap that we're talking about.  So two hours.

(Emphasis added.)

The DPA then concluded the State's closing argument, stating:

> We're not asking the jury to fill in blanks, ladies and gentlemen.  You are permitted to use circumstantial evidence to draw reasonable inferences.  All the evidence before you point to the defendant as the one who stabbed [M.K.] attempting to cause her death on the beach in Kahala on July 8, 2020.

In his closing, defense counsel commented on the absence of direct evidence.  No witness saw the attack take place.  HPD's grid search of the area turned up no suspect and no weapon was ever recovered.  The State introduced no evidence of motive.  Further, the lead detective on the case, Detective Lacuata, was not called to testify.

Defense counsel directly addressed the DPA's comments as to Edward Leal's testimony:

> Then there's Edward Leal.  Edward Leal was a landscaper who was working at 4635 Kahala Avenue.  He says he saw a hapa guy with curly hair up at that white sink in the vacant lot adjoining the property.  Edward Leal did not identify the defendant in court as the individual he saw standing at the white sink. He did not.  The prosecutor never asked him that.
>
> Don't you think, ladies and gentlemen, if Edward Leal could say the man at the white sink who the prosecution says was washing blood off his hands and his face and washing blood off his white T-shirt – don't you think if Edward Leal could say that guy was the defendant, the prosecutor would have asked him that?  Nothing.  Nothing from Edward Leal establishing that the guy at the white sink was the defendant.
>
> And ladies and gentlemen, ask yourself this.  Where is the white sink?  The white sink was sitting in a vacant lot.  The police could very easily have taken that sink and

had it analyzed for blood, for fingerprints, for any evidence to establish that Erik Willis was the man standing at the white sink washing blood off his hands and his face and washing the blood out of that white T-shirt. Did the State present to you a single piece of evidence in this courtroom about that white sink? They produced nothing. Nothing.

Defense counsel similarly commented on the DPA's argument that Willis's shirt was stained with blood:

> And then [the DPA] argues to you, well, if you watch the video, when Erik Willis goes to the beach, his T-shirt is white, and when he comes back, the T-shirt is soiled.
>
> Did the State present any evidence to you in this courtroom that the stains on his shirt were blood stains as they have argued to you[?]

Finally, defense counsel called the State's timeline into question, emphasizing that Corporal Motas had been unable to identify Willis as the individual depicted in State's Exhibits 3 and 4:

> So to continue, ladies and gentlemen, the State offers you more surveillance video. State's Exhibit 4, the video from 4635 Kahala Avenue; and State's Exhibit 3, the surveillance video from 4671 Kahala Avenue, the beach access. And the State attempts to create this time line for you of what happened on July 8th, 2020.
>
> The problem is, ladies and gentlemen, when Corporal Motas testified at trial before you in this courtroom, he told you in no uncertain terms that he could not identify the individual in State's Exhibit 4, the surveillance video from 4635 Kahala Avenue; and State's Exhibit 3, the surveillance video from the beach access at 4671 Kahala Avenue. He testified in no uncertain terms that he could not identify that person as the defendant, Erik Willis.

**d.    The verdict**

The jury found Willis guilty as charged of attempted murder in the second degree. Willis then filed a motion for new trial based on sufficiency of the evidence and prosecutorial

misconduct, which the circuit court denied.  On July 20, 2022, the circuit court entered its Amended Judgment of Conviction and Sentence.  Willis timely appealed.

## C.   Appellate Proceedings

### 1.   ICA Proceedings

On appeal to the ICA, Willis argued that the DPA "committed multiple, continuing, and egregious acts of misconduct throughout the course of the trial and especially during his closing arguments that violated Mr. Willis's constitutional right to a fair trial."[2]  In its answering brief, the State rebuffed Willis's arguments of misconduct and asked the ICA to affirm his conviction and sentence.

The ICA agreed with Willis that the DPA committed prosecutorial misconduct.  Its analysis focused on two statements from the DPA's closing argument.  The ICA held

_____

[2]     Willis raised five points of error before the ICA: (1) the circuit court "erred in denying [Willis's] Motion to Dismiss the Indictment for lack of probable cause"; (2) the circuit court "erred in denying [Willis's] Motion to Suppress Identification of the Defendant"; (3) "[t]he prosecutor committed multiple, continuing, and egregious acts of misconduct throughout the course of the trial and especially during his closing arguments that violated [Willis's] constitutional right to a fair trial"; (4) the circuit court "erred in denying [Willis's] Motion for Judgment of Acquittal"; and (5) the circuit court "abused its discretion in denying [Willis's] Motion for New Trial based on sufficiency of the evidence and prosecutorial misconduct."  The ICA held that the circuit court did not err in denying Willis's motion to dismiss the indictment, motion to suppress identification, and motion for judgment of acquittal.  State v. Willis (Willis II), 154 Hawai'i 160, 163, 548 P.3d 714, 717 (App. 2024).  Willis did not file a certiorari application challenging these holdings and thus they are not addressed in this opinion.  As to the denial of Willis's motion for a new trial, the ICA held that "the Circuit Court erred in denying Willis's motion for a new trial based on prosecutorial misconduct."  Id. at 173, 548 P.3d at 727.

15

that the [DPA] committed prosecutorial misconduct during his closing argument, when he argued to the jury that Willis was depicted in a surveillance video after the attack leaving a work sink, and "we know from [witness] Edward Leal [(Leal)] that [Willis] washed his hands and his face because he had blood on them." The DPA's statement referred to evidence of blood that was not in the record and misrepresented the testimony of the identified witness. Another statement by the DPA minutes later – that "after he stabbed [M.K.], [Willis] got blood on [his t-shirt]" – also introduced new evidence of blood in closing argument and amounted to misconduct. Based on the serious nature of the DPA's conduct, the lack of a curative instruction, and the heavy dependence of the conviction on M.K.'s credibility, we conclude that the DPA's improper statements about blood on Willis and his shirt were not harmless beyond a reasonable doubt, and his conviction must therefore be vacated. Relatedly, we hold that the Circuit Court erred in denying Willis's motion for a new trial based on prosecutorial misconduct in introducing this new blood evidence in closing argument.

State v. Willis (Willis II), 154 Hawaiʻi 160, 163, 548 P.3d 714, 717 (App. 2024) (footnotes omitted, brackets in original).

Consistent with its holding, the ICA vacated the circuit court's Amended Judgment of Conviction and Sentence and remanded the case for a new trial.

## 2. Supreme Court Proceedings

The State now asks this court to reverse the ICA's opinion and judgment on appeal.

The ICA vacated Willis's conviction on the basis that the DPA misstated the evidence during closing arguments when he said Edward Leal had testified that Willis "washed his hands and his face because he had blood on them." The State argues that the "ICA misconstrued the meaning of the deputy prosecutor's words," noting that "the written transcript of the closing

16

argument does not accurately represent the prosody of the deputy prosecutor's words." The State contends that the audio recording of the closing argument makes clear that the DPA was merely <u>arguing</u> that there was blood on Willis's t-shirt, rather than stating that as a fact.

The State also contends that "the context of the deputy prosecutor's words make it clear" that the prosecutor was arguing that Willis had blood on his t-shirt based on reasonable inferences from the surveillance video footage and "the extremely close proximity of the person in the video washing his hands and face to where the stabbing had taken place moments before." The State emphasizes that the DPA was merely drawing a reasonable inference based on the circumstantial evidence presented at trial. Further, the State argues, "it is implausible that the jury would have believed that Leal testified that Willis had blood on his face and hands simply because the deputy prosecutor had said it," given that Leal did not so testify, and the jury's ability to review the video footage and observe that they could not see blood on Willis or his t-shirt.

Finally, the State argues that even if the DPA mischaracterized Leal's testimony, it was harmless beyond a reasonable doubt because the key evidence in the case was the

video surveillance footage, which clearly showed Willis near the scene of the crime.

Willis asks this court to affirm the ICA's judgment vacating his conviction. He argues that the ICA did not err in concluding that the DPA committed misconduct during his closing argument. Willis contends that "[w]hether the Deputy Prosecutor paused before the word 'because' or not does not make his statements in closing any less misleading, less improper, or less prejudicial." Because no witness identified Willis as the individual at the sink, "any argument that it was Erik Willis at the white sink or that he was washing blood off his person or his clothing would be improper since it could not be reasonably inferred from the evidence."

Willis emphasizes that HPD did not seize or analyze the white sink at any point, nor was there any physical evidence that would have linked Willis, or any other individual, to the sink. Thus, he contends that the DPA should not have "rhetorically asked the jury to speculate about the identity of the person at the sink and the presence of blood," and that such statements were prosecutorial misconduct that warranted a vacatur of Willis's conviction.

Finally, Willis stresses that the impact of the DPA's improper comments was not harmless beyond a reasonable doubt. He argues that the State's evidence was not overwhelming because

the State's case was predicated entirely on M.K.'s identification of Willis as her assailant.[3]

### III. STANDARD OF REVIEW

"Whenever a defendant alleges prosecutorial misconduct, this court must first decide: (1) whether the conduct was improper;" and "(2) if the conduct was improper, whether the misconduct was harmless beyond a reasonable doubt." State v. Udo, 145 Hawai'i 519, 534-35, 454 P.3d 460, 475-76 (2019) (citing State v. Maluia, 107 Hawai'i 20, 25-26, 108 P.3d 974, 979-80 (2005)). "Prosecutorial misconduct is not harmless beyond a reasonable doubt if 'there is a reasonable possibility that the misconduct complained of might have contributed to the conviction.'" Id. at 535, 454 P.3d at 476 (quoting State v. Wakisaka, 102 Hawai'i 504, 513, 78 P.3d 317, 326 (2003)).

Further, "[i]f defense counsel does not object at trial to prosecutorial misconduct, this court may nevertheless recognize such misconduct if plainly erroneous." State v. Austin, 143 Hawai'i 18, 28, 422 P.3d 18, 28 (2018) (quoting Wakisaka, 102 Hawai'i at 513, 78 P.3d at 326). "Because prosecutorial misconduct impacts the fundamental right to a fair

---

[3]    Willis further requests this court to address "additional issues of prosecutorial misconduct, sufficiency of the evidence, and suppression of the eyewitness identification." These issues were not raised in any application for writ of certiorari, are in any event without merit and, therefore, are not discussed herein.

trial, there is no difference between the plain error and harmless beyond a reasonable doubt standards of review." State v. Hirata, 152 Hawai'i 27, 31, 520 P.3d 225, 229 (2022) (citing State v. Riveira, 149 Hawai'i 427, 431 n.10, 494 P.3d 1160, 1164 n.10 (2021)).

## IV. DISCUSSION

This court has defined prosecutorial misconduct as "a legal term of art that refers to any improper action committed by a prosecutor, however harmless or unintentional." Udo, 145 Hawai'i at 534, 454 P.3d at 475 (citing Maluia, 107 Hawai'i at 25, 108 P.3d at 979). "The first factor of the prosecutorial misconduct analysis is determining whether the DPA's conduct was improper." Id. at 535, 454 P.3d at 476. This determination requires the court to consider "the nature of the challenged conduct in relation to our criminal justice system generally and the special role of the prosecutor specifically." State v. Underwood, 142 Hawai'i 317, 325, 418 P.3d 658, 666 (2018) (citation omitted). Prosecuting attorneys have "a duty to seek justice, to play fair and square." Hirata, 152 Hawai'i at 33, 520 P.3d at 231. And given the important role that prosecuting attorneys play in our criminal justice system, this court acknowledges that "a prosecutor's 'improper suggestions, insinuations, and especially assertions of personal knowledge

are apt to carry much weight against the accused when they should properly carry none.'" State v. Clark, 83 Hawai'i 289, 304, 926 P.2d 194, 209 (1996) (quoting State v. Marsh, 68 Haw. 659, 661, 728 P.2d 1301, 1302 (1986)).

"Prosecutors are also forbidden from introducing new information or evidence in closing argument." Hirata, 152 Hawai'i at 33, 520 P.3d at 231. However, this restriction does not prohibit prosecuting attorneys from crafting arguments based on the evidence in the record. "[I]t is well-established that prosecutors are afforded wide latitude in closing to discuss the evidence, and may 'state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence.'" Udo, 145 Hawai'i at 536, 454 P.3d at 477 (quoting Clark, 83 Hawai'i at 304, 926 P.2d at 209). Of course, "this latitude is not without limit. '[T]he scope of [the prosecutor's] argument must be consistent with the evidence and marked by the fairness that should categorize all of the prosecutor's conduct.'" State v. Pasene, 144 Hawai'i 339, 367, 439 P.3d 864, 892 (2019) (quoting State v. Rogan, 91 Hawai'i 405, 413, 984 P.2d 1231, 1239 (1999) (brackets in original)). A prosecutor's comments must also be legitimate, that is, they must "draw reasonable inferences from the evidence." State v. Mainaaupo, 117 Hawai'i 235, 253, 178 P.3d 1, 19 (2008). An

inference is reasonable when "the evidence bears a logical and proximate connection to the point the prosecutor wishes to prove." State v. Basham, 132 Hawai'i 97, 112, 319 P.3d 1105, 1120 (2014) (quoting United States v. Waldemer, 50 F.3d 1379, 1384 (7th Cir. 1995).

In the present case, the DPA's statements regarding the blood on Willis's hands and shirt were based on reasonable inferences drawn from the significant circumstantial evidence put on at trial and, thus, did not amount to prosecutorial misconduct.

The DPA began his closing argument with a statement to the jury regarding circumstantial evidence and its role in the State's case against Willis:

> Circumstantial evidence, which is set forth in your jury instructions . . . permits a reasonable inference to be drawn as to the existence of another fact. . . .
>
> So there's two types of evidence, direct and circumstantial. And as we have stated, there's significant circumstantial evidence which points to the defendant.
>
> So let's start looking at some of that. And we're going to begin with a time line.

The DPA then focused on the surveillance videos and related witness testimony to construct a timeline that put Willis near the scene of the stabbing at the time it occurred on July 8, 2020. Corporal Motas positively identified Willis in five separate surveillance videos entered into evidence at trial. These videos showed Willis (1) leaving Niu Valley; (2)

22

taking the bus to Kahala and exiting at a stop near 4671 Kahala Avenue at 1:25 p.m.; (3) walking into a driveway at 948 Pueo Street in Kahala at 3:56 p.m., roughly two hours after the stabbing occurred; (4) boarding the bus at 948 Pueo Street and traveling back to the bus stop at the intersection of Kalaniana'ole Highway and West Halemaumau Street in Niu Valley; and (5) walking toward his Niu Valley residence.[4]

In each of the videos in which Corporal Motas identified Willis, Willis was wearing the same clothing: white t-shirt, blue clinical mask, light-colored pants, and black shoes. Willis's clothing and physical appearance in this footage match that of the unidentified person of interest in the surveillance footage showing that person approaching the beach access at 4671 Kahala Avenue at 1:26 p.m., just one minute after Willis departed the bus across the street from that location. Willis's clothing and physical appearance in the videos in which he was identified also match the descriptions of M.K.'s assailant given by M.K. and Taylor Gray. Given the proximity in space and time, as well as the matching physical descriptions of the defendant, the DPA drew a logical inference when he argued

---

[4] The defense conceded that the individual seen in surveillance video "riding the bus from Niu Valley to Kahala and then from Kahala back to Niu Valley," and the individual "walking down the sidewalk in Niu Valley," was Willis.

that Willis was the individual depicted in the surveillance video taken from 4671 Kahala Avenue.

The DPA then noted the testimony from M.K. and Gray, who both testified that, after stabbing M.K. on the beach, the attacker ran away in the 'Ewa direction toward 4635 Kahala Avenue. According to Gray, this occurred sometime shortly before 1:47 p.m., when Gray made the 911 call to report the attack on M.K. At 1:46 p.m., the surveillance footage from 4635 Kahala Avenue shows a shirtless person matching Willis's description run onto the adjacent vacant lot from the direction of the beach. That person then appears to wash themselves off at a white sink. Edward Leal, who was working that day at 4635 Kahala Avenue and is visible in the video, testified that he saw someone in the lot washing his arms and face in a white sink around that same time.

Recounting Leal's testimony together with the video evidence in closing, the DPA argued:

> Ladies and gentlemen, this is State's Exhibit 4. And the time is 1:46:22. First of all, before we go, notice <u>defendant is here</u>. No shirt because it's soiled. Pants, light colored pants. Shoes, looks like some sort of marking on the side of it.
>
> . . . .

> You notice he's turning, leaving the sink, and he's got something behind his back curled up. It's white. State submits that's his shirt. So we don't know whether he washed the shirt at the sink, but <u>we know from Edward Leal that he washed his hands and his face because he had blood on them</u>.

(Emphases added.)

Again, no witness had identified Willis as the individual portrayed in State's Exhibit 4.[5] However, given the sequence of events established by the evidence, and read in context of the entire closing, there was a logical basis for the DPA to infer that the person seen washing in the sink in the surveillance video, and the person Edward Leal saw, was Willis. As such, the DPA made a legitimate argument when he stated, "So

---

[5] Defense counsel emphasized in closing that Corporal Motas was unable to identify Willis in the videos introduced as State's Exhibits 3 and 4. In doing so, the defense also explained why it would be particularly difficult for anyone to make a positive identification from those videos:

> If anybody was familiar with the defendant's appearance, it was Corporal Motas. And he told you in no uncertain terms that he could not identify the person in State's Exhibit 3 and State's Exhibit 4 as Erik Willis.
>
> And to his credit, ladies and gentlemen, he was telling you the truth. Look at the videos. The video from 4635 Kahala Avenue is taken from a camera on a pole that Sergeant Matsuo told you was 15 feet in the air pointed at Kahala Avenue, a significant distance from the white sink. Look at the video. You cannot make an identification of the person walking up to the white sink from that video. The camera's too far away.
>
> And you look at State's Exhibit 3, the video from 4671 Kahala Avenue beach access. The resolution on that video is terrible. And it lasts for ten seconds. Not even ten seconds. An individual walks in front of the camera. You can't even see the individual's face.
>
> So when Corporal Motas tells you, I can't identify the person in that video, he's right. Nobody can.

we don't know whether he washed the shirt at the sink, but we know from Edward Leal that he washed his hands and his face[.]"

The ICA interpreted the remainder of the DPA's comment, "because he had blood on them," as a literal statement of fact which "referred to evidence of blood on Willis that was not in the record and, indeed, misrepresented evidence that was in the record." Willis II, 154 Hawai'i at 171, 548 P.3d at 725. However, when the DPA's statement is properly read in context of the DPA's entire closing argument and the trial record as a whole, it becomes clear that the DPA was making an argument based on a reasonable inference from the evidence. See State v. Bruce, 141 Hawai'i 397, 407, 411 P.3d 300, 309 (2017) (holding that the prosecutor's challenged comments considered in context were "properly viewed as a part of the State's argument"); State v. Marsh, 68 Haw. 659, 661, 728 P.2d 1301, 1302 (1986) (weighing the prosecutor's challenged comments in context of the entire trial record).

The audio recording of the closing arguments provides further context for the DPA's statement. As the State argues, the recording "clearly reflects a significant pause before the word 'because.'" Review of the audio recording supports the State's position that to those in the courtroom the DPA's

26

statement was presented as "we know from Edward Leal that he washed his hands and his face . . . because he had blood on them."  While the DPA's statement could have been more clearly worded, it was not likely to be interpreted in the courtroom as a misstatement of the evidence.  Rather, the context clearly signaled that the DPA was arguing an inference regarding the presence of blood.  The jury had heard Leal's testimony and had seen the video evidence for themselves.  Jurors have the common-sense ability to distinguish between an inartful choice of words and a blatant misrepresentation of the record.

Furthermore, it was within the wide latitude afforded to prosecutors for the DPA to comment on the soiled condition of Willis's shirt.  Video evidence shows Willis with a clean white t-shirt earlier in the afternoon, from the time he left Niu Valley until he departed the city bus in Kahala.  Later video shows Willis in a soiled t-shirt when he reappears in the hours after M.K.'s stabbing.  Taylor Gray testified that the man she saw running from the beach had something on the center of his white shirt.  At the time of closing, the jury had seen these videos, M.K. and Gray had recounted the circumstances of the stabbing, and M.K. had identified Willis as her attacker in the courtroom.  In that context, the DPA was making a fair comment

on the evidence, and not presenting wholly new evidence, when he

made the following statement:

> Shirt is soiled.  So what happened was that after the defendant arrived to the beach with a clean white T-shirt, after he stabbed [M.K.], <u>he got blood on it</u>, possibly sand. Tried to wash it out, and disappeared for two hours.
>
> So what to do?  The defendant is on the beach.  He's targeted [M.K.]  He's on an isolated portion of the beach. He stabs her repeatedly.  Then he stops and he gets up and he looks and he sees that Taylor Gray is looking at him.
>
> So what does he do?  He runs.  He runs down the beach.  He runs up the vacant lot.  He has to clean up. You run away, you clean up, you hide and wait.  So he ran away, he cleaned up.  Now he has to hide and wait.

(Emphasis added.)

This characterization of the DPA's statements is

further supported by Willis's failure to immediately object at

trial.  Willis raised objections at several points throughout

the closing argument, but did not object in response to either

of the DPA's statements that the ICA later identified as

prosecutorial misconduct.  Failure to object does not prohibit a

defendant from raising prosecutorial misconduct as an issue on

appeal, as Willis has here.  It does, however, tend to suggest

that those in the courtroom at the time of closing did not

interpret the DPA's statements as a mischaracterization of the

evidence.  Moreover, to the extent there had been any confusion

as to the nature of the DPA's statements, Willis's response to

the challenged statements in closing clarified the state of the

evidence:

> Don't you think, ladies and gentlemen, if Edward Leal could say the man at the white sink who the prosecution says was washing blood off his hands and his face and washing blood off his white T-shirt – don't you think if Edward Leal could say that guy was the defendant, the prosecutor would have asked him that?  Nothing.  Nothing from Edward Leal establishing that the guy at the white sink was the defendant.

> And ladies and gentlemen, ask yourself this.  Where is the white sink?  The white sink was sitting in a vacant lot.  The police could very easily have taken that sink and had it analyzed for blood, for fingerprints, for any evidence to establish that Erik Willis was the man standing at the white sink washing blood off his hands and his face and washing the blood out of that white T-shirt.  Did the State present to you a single piece of evidence in this courtroom about that white sink? They produced nothing. Nothing.

Based on the foregoing, we conclude that the DPA's

challenged statements, which were based on reasonable inferences

from the evidence, were not improper.  Further, because the

DPA's actions were not improper, we need not determine whether

any alleged misconduct was harmless beyond a reasonable doubt.[6]

---

[6] Although it is not necessary to our holding, we note that we would also depart from the ICA's harmless error analysis, and, in particular, its characterization of the evidence here.  The ICA determined that the evidence against Willis was "not overwhelming," and that the State's case "depended heavily on the credibility of M.K."  Respectfully, we disagree.

M.K.'s identification of Willis, though undeniably important, was only one piece of the State's case against Willis.  The State also presented considerable video evidence and witness testimony that support Willis's conviction.  Surveillance video placed Willis near the scene of the crime at the time in question.  Taylor Gray and Edward Leal provided descriptions consistent with the surveillance video, M.K.'s testimony, and the State's version of events.  Thus, although the State lacked physical evidence against Willis, the circumstantial evidence was substantial and went beyond M.K.'s identification alone.

Accordingly, we hold that the DPA did not commit prosecutorial misconduct.

### V.    CONCLUSION

For the foregoing reasons, we (1) vacate the ICA's July 1, 2024 Judgment on Appeal and (2) affirm the circuit court's July 20, 2022 Amended Judgment of Conviction and Sentence.

| | |
|---|---|
| Brian R. Vincent<br>Lawrence A. Sousie<br>for petitioner | /s/ Mark E. Recktenwald<br><br>/s/ Sabrina S. McKenna |
| Eric A. Seitz<br>(Della A. Belatti,<br>Jonathan M.F. Loo, and<br>Kevin A. Yolken,<br>on the briefs)<br>for respondent | /s/ Todd W. Eddins<br><br>/s/ Lisa M. Ginoza<br><br>/s/ Vladimir P. Devens |

